**Willie Lloyd TURNER, Petitioner–Appellant,**

v.

**David A. WILLIAMS, Warden, Powhatan Correctional Center, Respondent–Appellee.**

No. 93–4001.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 8, 1993.

Decided Sept. 15, 1994.

**ARGUED:** William Bradford Reynolds, Sr., Dickstein, Shapiro & Morin, Washington, DC, for appellant. Robert H. Anderson, III, Asst. Atty. Gen., Office of the Atty. Gen., Richmond, VA, for appellee. **ON BRIEF:** Walter J. Walvick, Dickstein, Shapiro & Morin, Washington, DC, for appellant. Stephen D. Rosenthal, Atty. Gen. of VA, Office of the Atty. Gen., Richmond, VA, for appellee.

Before HALL, LUTTIG, and MICHAEL, Circuit Judges.

Affirmed by published opinion. Judge MICHAEL wrote the opinion, in which Judge K.K. HALL joined. Judge LUTTIG wrote a separate opinion, concurring in the judgment.

## OPINION

MICHAEL, Circuit Judge:

Petitioner Willie Lloyd Turner is a Virginia prisoner who was convicted of murder and first sentenced to death in 1979. In 1986, after state and federal collateral review, the United States Supreme Court vacated his sentence and remanded for resentencing. In 1987, a Virginia jury again sentenced him to death. In 1992, after unsuccessful direct and collateral review in the Virginia courts, Turner petitioned the United States District Court for the Eastern District of Virginia for relief pursuant to 28 U.S.C. § 2254. The district court denied that relief. *Turner v. Williams*, 812 F.Supp. 1400 (E.D. Va.1993). Turner appeals, arguing that the district court erred in dismissing (1) his claims attacking the application of a statutory aggravating factor that permits imposition of death upon a finding that the defendant's conduct was "outrageously or wantonly vile, horrible or inhuman," and (2) his several ineffective assistance of counsel claims. For the reasons that follow, we affirm.

## I

On the morning of July 12, 1978, Turner entered Smith Jewelers, owned and operated by W. Jack Smith, Jr. in City of Franklin, Virginia. Turner went in the store with a sawed-off shotgun wrapped in a towel. Without saying a word, Turner displayed his shotgun and motioned to Smith. Smith immediately began stuffing money into a jewelry bag. While he was filling the bag, Smith inconspicuously activated the store's silent alarm to the police department. Meanwhile, Turner directed the several customers and employees present to line up behind the store counter, kicking a customer in the process.

Shortly after Smith triggered the alarm, a police officer, Alan D. Bain, Jr. arrived at the store and told Smith that his alarm was activated. Turner pointed his shotgun at Officer Bain's head and ordered him to remove his revolver from its holster and put it on the floor. Turner then grabbed Officer Bain's revolver off the floor, jabbed his shotgun at the officer, and directed him to the back of the store with the others.

Turner, now brandishing his shotgun in one hand and Bain's revolver in the other, fired the revolver into the back wall of the store. He threatened to "start killing" if another police officer showed up. At this point, without any provocation, Turner pointed the revolver at Smith and fired. The bullet struck Smith in the head. Smith yelled, slumped over the counter and fell to the floor, unconscious, gurgling, and bleeding from the head. The shot caused bleeding and bruising on Smith's brain surface, but was not fatal.

At this point, Officer Bain began talking to Turner. He offered to take Turner out of the store if he would agree not to shoot anyone else. While Bain talked to Turner, two customers were able to escape from the store. Turner then said, "I'm going to kill this nigger squealer," JA 314, referring to Smith, who was not African American. Turner then immediately reached over the counter with the revolver and fired two close-range shots into the left side of Smith's chest. The shots caused Smith's body to jump. (One of the bullets penetrated his

heart, food and wind pipes before ultimately lodging in his spine; the other bullet passed through his lung and out his back. Medical testimony established that either of the two shots to the chest would have been fatal.) Immediately after these shots, Officer Bain was able to shove Turner and grab his weapons. Bain then forced Turner to get down on the floor and called for help.

On December 4, 1979, Turner was convicted for murdering Smith, and on December 6, 1979, a jury in Northampton County recommended that he be sentenced to death. On direct appeal, the Supreme Court of Virginia affirmed the conviction and sentence, and the United States Supreme Court denied certiorari. *Turner v. Commonwealth*, 221 Va. 513, 273 S.E.2d 36 (1980), *cert. denied sub nom. Turner v. Virginia*, 451 U.S. 1011, 101 S.Ct. 2347, 68 L.Ed.2d 863 (1981). Turner then filed a petition for a writ of habeas corpus in the circuit court of Southampton County, Virginia. That petition was denied, and the Supreme Court of Virginia affirmed. The United States Supreme Court again denied his certiorari petition. *Turner v. Virginia*, 462 U.S. 1112 (1983).

Turner next sought relief in the federal courts. On July 27, 1983, he filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Virginia. The petition was denied, and our court affirmed. *Turner v. Bass*, 753 F.2d 342 (4th Cir.1985). Turner then filed another certiorari petition in the United States Supreme Court, which was granted. On April 30, 1986, the Supreme Court vacated Turner's death sentence (but not his conviction) because the trial court had refused to question prospective jurors about possible

bias resulting from the fact that Turner was African American and his victim was white. *Turner v. Murray*, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986). The Supreme Court remanded the case, which ultimately went to the circuit court of Southampton County for a new sentencing hearing.[1]

Turner was represented at resentencing by court-appointed lawyers, J. Lloyd Snook, III and Thomas L. Woodward, Jr. The resentencing hearing (a jury proceeding) occurred on January 7–9 and 12, 1987. The Commonwealth finished its case on Friday, January 9, and the defense rested on Monday, January 12, without putting on any mitigating evidence. The jury was then instructed. Under Virginia's death penalty scheme, the jury may fix the sentence at death if it finds either one of two aggravating factors: (1) "that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" (the "future dangerousness" factor), or (2) "that his conduct in committing the offense ... was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or aggravated battery to the victim" (the "vileness" factor). Va.Code Ann. § 19.2–264.2 (Michie 1990).[2] Turner's jury was given limiting instructions that defined the "aggravated battery" and "depravity of mind" components of the vileness factor.

On January 12, 1987, Turner's resentencing jury returned a verdict fixing his sentence at death based solely on the vileness factor.[3] His sentence was upheld on direct appeal to the Supreme Court of Virginia, and the United States Supreme Court denied his

---

1. We will refer to the original (1979) sentencing proceeding and related collateral proceedings as "*Turner I*" and to the resentencing proceeding and related collateral proceedings as "*Turner II*."

2. In full, Virginia's death penalty statute provides:

In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court or jury shall (1) after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant

would commit criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim; and (2) recommend that the penalty of death be imposed.

3. Although the trial court instructed the jury on the "future dangerousness" factor, the jury did not find that factor established. In *Turner I*, however, the jury found both the vileness factor and the future dangerousness factor.

certiorari petition. *Turner v. Commonwealth*, 234 Va. 543, 364 S.E.2d 483, *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988).

Turner then filed a petition for a writ of habeas corpus in the circuit court of Southampton County, alleging ineffective assistance of counsel and other claims. On September 11–13, 1989, the state court held an evidentiary hearing on some of his ineffective assistance claims; all other claims were dismissed without an evidentiary hearing. On May 23, 1990, the court issued a letter order that adopted the Commonwealth's proposed findings of fact and rejected Turner's ineffective assistance claims. On July 5, 1990, the court issued a formal order incorporating the letter order and dismissing Turner's habeas petition. On April 30, 1991, the Supreme Court of Virginia dismissed Turner's habeas appeal. *Turner v. Williams*, No. 901335 (Va. Apr. 30, 1991). That court rejected his ineffective assistance claims on the merits and concluded that his other claims were procedurally defaulted.

Turner next sought collateral review in the federal courts. On December 10, 1991, he filed a 28 U.S.C. § 2254 petition for a writ of habeas corpus in the United States District Court for the Eastern District of Virginia. The Commonwealth moved for dismissal under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. On February 1, 1993, the district court granted the Commonwealth's motion for summary judgment and dismissed his petition. *Turner v. Williams*, 812 F.Supp. 1400 (E.D.Va.1993). The court found that most of Turner's claims were procedurally barred and rejected the others on the merits. Turner now appeals to this court.

Turner's claims on this appeal can be grouped in two general categories. First, he

raises several challenges to the application of the vileness factor. Second, he says his lawyers rendered ineffective assistance in several respects.[4] The Commonwealth responds that all of Turner's claims are barred under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion), because they would require us to announce new constitutional rules of criminal procedure on collateral review. The Commonwealth next asserts that Turner's challenges to the application of the vileness factor, as well as one of his ineffective assistance claims, are procedurally barred. We must first address these arguments to determine whether we can even reach the merits of Turner's claims.

## II

In *Teague v. Lane*, a plurality of the Supreme Court adopted the second Justice Harlan's retroactivity approach and held that a "new rule" of federal constitutional law will not be applied or announced on collateral review unless the rule falls within one of two narrow exceptions.[5] *See generally Teague*, 489 U.S. at 299–316, 109 S.Ct. at 1068–78 (plurality opinion). Shortly thereafter, *Teague*'s retroactivity approach was adopted by a majority of the Court and held to apply to capital cases. *See Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). The new rule principle is predicated on interests in comity and in the finality of criminal convictions. *Gilmore v. Taylor*, —— U.S. ——, ——, 113 S.Ct. 2112, 2116, 124 L.Ed.2d 306 (1993).

The principle announced in *Teague* serves to ensure that gradual developments in the law over which reasonable jurists may disagree are not later used to upset the finality of state convictions valid when entered.

---

4. Turner does not appeal the numerous other claims dismissed by the district court below.

5. The first exception is for new rules that place "certain kinds of primary, private individual conduct beyond the power of the criminal lawmaking authority to proscribe." *Teague*, 489 U.S. at 311, 109 S.Ct. at 1075 (plurality opinion) (internal quotation marks omitted). The second exception is for "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle v. Parks*, 494 U.S. 484, 495, 110 S.Ct. 1257, 1264, 108 L.Ed.2d 415 (1990). Because we ultimately conclude that Turner's claims are not barred by *Teague*, we need not discuss whether his claims can fit within either narrow exception.

This is but a recognition that the purpose of federal habeas corpus is to ensure that state convictions comply with the federal law in existence at the time the conviction became final, and not to provide a mechanism for the continuing reexamination of final judgments based upon later emerging legal doctrine.

*Sawyer v. Smith*, 497 U.S. 227, 234, 110 S.Ct. 2822, 2827, 111 L.Ed.2d 193 (1990).

Generally, there are two types of *Teague* cases. In the first type, the petitioner seeks to rely on a decision announced after his conviction became final. In the second type, the petitioner relies on a decision announced before his conviction became final. In the latter, "it is necessary to inquire whether granting the relief sought would create a new rule because the prior decision is applied in a novel setting, thereby extending the precedent." *Stringer v. Black*, —— U.S. ——, ——, 112 S.Ct.1130, 1135, 117 L.Ed.2d 367 (1992); *see also Nickerson v. Lee*, 971 F.2d 1125, 1132 n. 12 (4th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1289, 122 L.Ed.2d 681 (1993).

The policy behind the new rule principle is desirable; but applying that principle leaves something to be desired, for "[i]t is admittedly often difficult to determine when a case announces a new rule...." *Teague*, 489 U.S. at 301, 109 S.Ct. at 1070 (plurality opinion). In *Teague*, the plurality said:

In general, ... a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final. *Id.* (citations omitted); *see also Penry*, 489 U.S. at 314, 109 S.Ct. at 1077; *Saffle v. Parks*, 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990); *Butler v. McKellar*, 494 U.S. 407, 412, 110 S.Ct. 1212, 1216, 108 L.Ed.2d 347 (1990); *Sawyer*, 497 U.S. at 234, 110 S.Ct. at 2827; *Stringer*, —— U.S. at ——, 112 S.Ct. at 1135; *Graham v. Collins*, —— U.S. ——, ——, 113 S.Ct. 892, 897, 122 L.Ed.2d 260 (1993); *Gilmore*, —— U.S. at ——, 113 S.Ct. at 2116; *Caspari v. Bohlen*, —— U.S. ——, ——, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). Subsequent cases have added more words (if not guidance) to the new rule inquiry. *See, e.g., Butler*, 494 U.S. at 415, 110 S.Ct. at 1217 (a case announces a new rule when the rule "was susceptible to debate among reasonable minds"); *Parks*, 494 U.S. at 488, 110 S.Ct. at 1260 (a case does not announce a new rule if "a state court considering [petitioner's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [petitioner] seeks was required by the Constitution"); *Sawyer*, 497 U.S. at 234, 110 S.Ct. at 2827 (a "gradual development[ ] in the law over which reasonable jurists may disagree" is a new rule); *Graham*, —— U.S. at ——, 113 S.Ct. at 898 (a case announces a new rule "unless reasonable jurists hearing petitioner's claim at the time his conviction became final 'would have felt compelled by existing precedent' to rule in his favor"). In its most recent new rule case, the Court set forth the following three-pronged approach:

In determining whether a state prisoner is entitled to habeas relief, a federal court should apply *Teague* by proceeding in three steps. First, the court must ascertain the date on which the defendant's conviction and sentence became final for *Teague* purposes. Second, the court must [s]urve[y] the legal landscape as it then existed, and determine whether a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution. Finally, even if the court determines that the defendant seeks the benefit of a new rule, the court must decide whether that rule falls within one of the two narrow exceptions to the nonretroactivity principle.

*Bohlen*, —— U.S. at ——, 114 S.Ct. at 953 (internal quotation marks and citations omitted). Guided by *Teague* and the cases it has spawned, we will proceed through the *Bohlen* formula.

Turner's conviction and sentence became final in 1988, when the United States Supreme Court denied his petition for certiorari in *Turner II.* We must therefore determine whether a state court considering Turner's claims in 1988 would have felt compelled to conclude that the rules he seeks were required by the Constitution. To do this, we address the Commonwealth's *Teague* challenges in turn, and we ultimately conclude that Turner does not seek new rules.

A. *The Applicability of* **Teague v. Lane** *to Turner's Claim that the Commonwealth Applied the Vileness Factor in an Unconstitutional Manner*

Turner contends that Virginia's facially vague vileness factor was not constitutionally applied in his case. Specifically, he says that the limiting definitions of "depravity of mind" and "aggravated battery" given to his jury were inadequate because they did not sufficiently cure the vague language of the vileness factor.[6] Further, he says the Supreme Court of Virginia, which applied the same limiting construction, did not cure that infirmity with an adequate review of his sentence. He thus seeks the benefit of a rule that a vague aggravating factor must be supplemented with constitutionally sufficient limiting instructions or appellate review.

Turner bases his claim on Justice Stewart's plurality opinion in *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), decided eight years before his conviction became final. In *Godfrey,* the Supreme Court vacated a death sentence that was based on an aggravating factor virtually identical to Virginia's vileness factor.[7] Godfrey's jury was instructed only with the bare language of the aggravating factor; the jury did not receive any limiting instructions. *Id.*

at 426, 100 S.Ct. at 1763–64 (plurality opinion). Moreover, on direct review the Georgia Supreme Court, in conclusory fashion, held that the evidence supported a finding of vileness; the court did not provide any limiting construction to narrow the statutory language. *Id.* at 427, 432, 100 S.Ct. at 1764, 1766–67 (plurality opinion).

Justice Stewart's plurality opinion began by noting that the language of the vileness factor was vague: There was nothing in the words " 'outrageously or wantonly vile, horrible, and inhuman' ... standing alone, that implie[d] any inherent restraint" on the jury's discretion to impose the death penalty. *Id.* at 428, 100 S.Ct. at 1764–65 (plurality opinion). The plurality observed that the Georgia courts did not cure that vagueness through adequate jury instructions or meaningful appellate review. *Id.* at 429, 432, 100 S.Ct. at 1765, 1766–67 (plurality opinion). In vacating Godfrey's sentence, the plurality emphasized a central tenet of the Court's Eighth Amendment jurisprudence: The state "must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." *Id.* at 428, 100 S.Ct. at 1764–65 (plurality opinion) (footnotes and internal quotation marks omitted).

We read *Godfrey* to say that the Eighth Amendment proscribes the imposition of a death sentence based on a vague aggravating factor unless the vague factor has been narrowed by a constitutionally sufficient limiting construction, either at sentencing (in the form of a limiting instruction when a jury is involved) or on appellate review. Not just any limiting construction will do; a *constitutionally sufficient* one is required. *See id.* at 433, 100 S.Ct. at 1767 (plurality opinion)

---

**6.** The resentencing court instructed the jury that "an aggravated battery is a battery which qualitatively and quantitatively is more culpable than the minimum necessary to accomplish an act of murder." JA 517–P. The court further instructed that "depravity of mind is a degree of moral turpitude and and [sic] psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation." JA 517–Q.

**7.** The Georgia factor permitted the imposition of death if it was found beyond a reasonable doubt that the offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." *Id.* 446 U.S. at 422, 100 S.Ct. at 1762 (plurality opinion) (quoting Ga.Code § 27–2534.1(b)(7) (1978)). *Compare supra* note 2 (Virginia statute).

("Thus, the validity of the petitioner's death sentences turns on whether ... the Georgia Supreme Court can be said to have applied a *constitutional construction* of the [vileness factor].") (emphasis added); *Jones v. Murray*, 976 F.2d 169, 174 (4th Cir.) ("[W]hen limiting instructions are used to cure a defect in a facially vague statute, the instructions must meet the specificity requirements of *Godfrey*."), *cert. denied*, — U.S. —, 113 S.Ct. 27, 120 L.Ed.2d 951 (1992); *Turner*, 753 F.2d at 353 (noting that the "constitutional flaw of *Godfrey*" was "the Georgia Court's failure to give a *constitutional construction* to the vileness criterion") (emphasis added). A limiting construction that is itself too vague leaves a defendant in no better position than the petitioner in *Godfrey*—sentenced on the basis of " 'standards so vague that they would fail adequately to channel the sentencing decision....' " *Godfrey*, 446 U.S. at 428, 100 S.Ct. at 1765 (plurality opinion) (quoting *Gregg v. Georgia*, 428 U.S. 153, 195 n. 46, 96 S.Ct. 2909, 2935 n. 46, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). "Vague terms do not suddenly become clear when they are defined by reference to other vague terms." *Cartwright v. Maynard*, 822 F.2d 1477, 1489 (10th Cir.1987) (en banc), *aff'd*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).[8]

■ *Godfrey* thus dictates Turner's challenge to the constitutional sufficiency of the limiting instructions given to his jury as well as the appellate review of his sentence. Indeed, the Supreme Court, in *Stringer v. Black, supra*, has recently held that the application of *Godfrey* did not amount to a new rule for purposes of *Teague*. *Stringer* addressed, *inter alia*, whether *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), announced a new rule under *Teague*. *Cartwright* involved an Oklahoma death sentence predicated on two aggravating factors, one of which permitted the imposition of a death sentence if the defendant's murder was "especially heinous, atrocious, or cruel" (the "heinousness" factor). *Cartwright*, 822 F.2d at 1478. Cartwright's sentencing jury was given a limiting instruction beyond the bare terms of the heinousness factor. *Id.* at 1488. On direct review, the Oklahoma Court of Criminal Appeals affirmed after applying a limiting construction to the facts of Cartwright's case, focusing on the "manner" in which the murder was committed. *See Cartwright v. Oklahoma*, 695 P.2d 548, 554 (Okla.Crim.App.1985). That court previously had approved jury instructions similar to those given to Cartwright's jury. *Cartwright*, 822 F.2d at 1487–88.

In his habeas petition, Cartwright alleged that the Oklahoma courts applied the heinousness factor in an unconstitutionally vague and overbroad manner in his case. *Id.* at 1478. Specifically, Cartwright claimed: (1) the language of the heinousness factor was vague, and (2) the Oklahoma courts failed to apply a constitutionally sufficient limiting construction (through jury instructions or on direct review of his sentence) to cure the vagueness. *Id.* The Tenth Circuit, sitting en banc, agreed. *See id.* at 1479 ("the Oklahoma courts failed to apply a constitutionally adequate narrowing construction in this case"), 1491, 1492. The Tenth Circuit's decision was predicated on *Godfrey*. *See id.* at 1489, 1491. The Supreme Court affirmed the Tenth Circuit. The Court noted the Tenth Circuit's conclusion that the Oklahoma courts had not "adopted a limiting construction that cured the infirmity" of the vague heinousness factor. *Cartwright*, 486 U.S. at

---

8. *See Shell v. Mississippi*, 498 U.S. 1, 3, 111 S.Ct. 313, 314, 112 L.Ed.2d 1 (1990) (Marshall, J., concurring) ("Obviously, a limiting instruction can be used to give content to a statutory factor that 'is itself too vague to provide any guidance to the sentencer' only if the limiting instruction's own 'definitions are constitutionally sufficient,' that is, only if the limiting instruction itself 'provide[s] *some* guidance to the sentencer.' " (quoting *Walton v. Arizona*, 497 U.S. 639, 654, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990)));

*Deutscher v. Whitley*, 884 F.2d 1152, 1162 (9th Cir.1989) ("The depravity of mind instruction ... fails to meet *Godfrey* requirements.... The depravity instruction in this case, although it contains more words, is no more capable of channeling discretion than the ... instruction rejected in [*Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988)] or the ... instruction in *Godfrey*."), *vacated on other grounds*, 500 U.S. 901, 111 S.Ct. 1678, 114 L.Ed.2d 73 (1991).

360, 108 S.Ct. at 1857. Significantly, the Court thought the Tenth Circuit "was quite right in holding that *Godfrey* controls this case." *Id.* at 363, 108 S.Ct. at 1858–59.

Then, four years after it decided *Cartwright*, the Court decided *Stringer v. Black.* In *Stringer,* the habeas petitioner attempted to rely on *Cartwright* to challenge the constitutionality of his death sentence. *Stringer,* —— U.S. at ——, 112 S.Ct. at 1133. The State of Mississippi invoked *Teague,* arguing that the petitioner could not rely on *Cartwright* because that decision was announced after his conviction became final. *Id.* The Court thus had to decide whether *Cartwright* announced a new rule, *i.e.,* whether Cartwright's challenge was dictated by *Godfrey.* *Id.* The Court held: "In applying *Godfrey* to the language before us in [*Cartwright*], we did not 'brea[k] new ground.' [*Cartwright*] was, therefore, for purposes of *Teague,* controlled by *Godfrey,* and it did not announce a new rule." *Id.* at ————, 112 S.Ct. at 1135–36 (quoting *Butler,* 494 U.S. at 412, 110 S.Ct. at 1216).

*Stringer* thus teaches that *Teague* does not bar a habeas petitioner's invocation of *Godfrey* to challenge the constitutional sufficiency of limiting instructions or appellate review if a state uses a vague aggravating factor. *See Wiley v. Puckett,* 969 F.2d 86, 97 (5th Cir.1992); *cf. Newlon v. Armontrout,* 885 F.2d 1328, 1331–35 (8th Cir.1989), *cert. denied sub nom. Delo v. Newlon,* 497 U.S. 1038, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990); *Smith v. Dixon,* 766 F.Supp. 1370, 1383–86 (E.D.N.C.1991), *aff'd,* 996 F.2d 667 (4th Cir. 1993), *rev'd on other grounds,* 14 F.3d 956

(4th Cir.1994) (en banc), *cert. denied,* —— U.S. ——, 115 S.Ct. 129, —— L.Ed.2d —— (1994); *Jones v. Murray,* 976 F.2d 169, 173 (4th Cir.) (both parties agreed that the application of *Godfrey* was not barred by *Teague* and therefore we did not have to reach the *Teague* issue; nevertheless, we indicated that challenges to Virginia's limiting instructions and appellate review were not barred by *Teague* ), *cert. denied,* —— U.S. ——, 113 S.Ct. 27, 120 L.Ed.2d 951 (1992).

The similarities between *Cartwright* and the instant case are striking. Like Cartwright, Turner was sentenced on the basis of a vague statutory aggravating factor. Like Cartwright, Turner's jury was given a limiting instruction and a limiting construction was applied on appellate review. Like Cartwright, Turner argues that the Commonwealth's limiting construction was constitutionally insufficient; *i.e.,* it did not cure the infirmity of the aggravating factor and thereby failed to guide adequately the jury's discretion. And, like Cartwright, Turner's challenge is predicated on *Godfrey.* Because *Stringer* expressly held that *Godfrey* dictated Cartwright's claim and thus Cartwright did not seek the benefit of a new rule for purposes of *Teague,* we are compelled to reach the same conclusion here.

In sum, we are satisfied that a state court in 1988 would have felt compelled to conclude that *Godfrey* and *Cartwright* dictate the rule or result Turner seeks. (Although *Cartwright* came down shortly after Turner's conviction became final, Turner may use that decision because *Cartwright* did not announce a new rule. *See generally Stringer, supra.*)[9]

---

9. Several Supreme Court decisions announced after Turner's conviction became final seemingly take for granted that challenges to a state's limiting construction are predicated on *Godfrey* and *Cartwright.* For example, in *Shell, supra,* a nonhabeas case, the Court, in a *per curiam* opinion, reversed the petitioner's sentence, saying: "Although the trial court in this case used a limiting instruction to define the [heinousness] factor, that instruction is not constitutionally sufficient." 498 U.S. at 1, 111 S.Ct. at 313 (citing *Godfrey* and *Cartwright* ). Similarly, *Walton v. Arizona, supra,* a nonhabeas case, involved a *Godfrey/Cartwright* challenge to Arizona's limiting construc-

tion of its heinousness factor. The Supreme Court said:

> When a federal court is asked to review a state court's application of an individual statutory aggravating ... circumstance in a particular case, it must first determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer. *If so, then the federal court must attempt to determine whether the state courts have further defined the vague terms and, if they have done so, whether those definitions are constitutionally sufficient, i.e.,* whether they provide *some* guidance to the sentencer.

The Commonwealth nevertheless emphasizes that before Turner's conviction became final in 1988, our court, in *Turner v. Bass, supra,* upheld a limiting construction of the vileness factor that was virtually identical to the limiting instruction given to Turner's jury and applied on direct review of his sentence. Thus, the argument follows, a Virginia court in 1988 would not have felt compelled to declare unconstitutional the specific limiting construction used in his case. *Cf. Graham,* —— U.S. at ——, 113 S.Ct. at 903. And, relatedly, the argument goes, a decision in Turner's favor would require the creation of a new rule insofar as it would repudiate *Turner v. Bass. See id.* at ——, 113 S.Ct. at 897.

Before we address this argument, we note that Turner challenges the limiting definitions of two components of the vileness factor, "aggravated battery" and "depravity of mind." In *Turner v. Bass,* however, we upheld only a (virtually identical) limiting definition of "aggravated battery"; we did not address the sufficiency of the "depravity of mind" limiting definition. *See Turner,* 753 F.2d at 353. Thus, were we to accept the Commonwealth's *Teague* theory here, at most we would be barred from reviewing the sufficiency of the aggravated battery definition.

Turning then to the limiting definition of aggravated battery applied in *Turner II,* the Commonwealth, on the face of it, appears to have a good argument that Turner seeks a new rule vis-a-vis *Turner v. Bass.* However, the answer is not so simple. The Commonwealth's theory focuses on *the most specific conclusion or holding* Turner hopes we reach: that the limiting definition used in his

case was constitutionally insufficient. But we cannot ignore the fact that the principle of law (the "constitutional rule[ ] of criminal procedure," *Teague,* 489 U.S. at 316, 109 S.Ct. at 1078 (plurality opinion)) from which Turner seeks to benefit is the extant rule propounded in *Godfrey* and reaffirmed in *Cartwright. Cf. Bohlen,* —— U.S. at ——, 114 S.Ct. at 955 (in its new rule analysis, the Court focused on the more general rule sought—that the Double Jeopardy Clause applies to a noncapital sentencing proceeding—as opposed to the specific holding sought by the petitioner, that his sentence violated the Double Jeopardy Clause). Here, we are asked simply to apply, rather than extend, the *Godfrey/Cartwright* principle. *Cf. Stringer,* —— U.S. at ——, 112 S.Ct. at 1135. Although "it can be a difficult question whether a particular holding presents simply a new setting for an old rule, or announces a new one," *Graham,* —— U.S. at ——, 113 S.Ct. at 918 (Souter, J., dissenting), we think the former best characterizes Turner's claim.

*Penry v. Lynaugh* makes the point. In *Penry,* the petitioner (Penry) claimed he "was sentenced to death in violation of the Eighth Amendment because the jury was not instructed that it could consider and give effect to his mitigating evidence in imposing its sentence." *Penry,* 492 U.S. at 307, 109 S.Ct. at 2941. On collateral review, the Fifth Circuit had rejected Penry's claim because his jury was allowed to hear all mitigating evidence (mental limitations and abused childhood). *See Penry v. Lynaugh,* 832 F.2d 915, 920 (5th Cir.1987), *aff'd,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). The court nevertheless was concerned that, under the Texas scheme, Penry's jury was not able

---

*Walton,* 497 U.S. at 654, 110 S.Ct. at 3057–58 (first emphasis added). In *Lewis v. Jeffers,* 497 U.S. 764, 774, 110 S.Ct. 3092, 3098–99, 111 L.Ed.2d 606 (1990), the habeas petitioner likewise argued that Arizona's construction of its heinousness factor contravened *Godfrey* and *Cartwright.* The Court said:

We have reiterated the general principle that aggravating circumstances must be construed to permit the sentencer to make a principled distinction between those who deserve the death penalty and those who do not.

Indeed, in [*Cartwright* ] we applied the teachings of *Godfrey* to hold that the Oklahoma courts *had not construed Oklahoma's [heinousness factor] in a manner sufficient* "to cure the unfettered discretion of the jury and to satisfy the commands of the Eighth Amendment." *Id.* at 776, 110 S.Ct. at 3100 (quoting *Cartwright,* 486 U.S. at 364, 108 S.Ct. at 1859) (emphasis added) (citations omitted); *see also Arave v. Creech,* —— U.S. ——, ———— ——, 113 S.Ct. 1534, 1540–41, 123 L.Ed.2d 188 (1993).

to consider and give effect to his mitigating evidence. *See generally id.* at 920–26. The Fifth Circuit concluded that it could not rule in Penry's favor "because *prior Fifth Circuit decisions have rejected claims similar to Penry's. These prior panel holdings bar a different holding by us.*" *Id.* at 926 (emphasis added) (citations omitted). Thus, granting Penry the relief he sought would have required the Fifth Circuit to overrule its precedents. The Supreme Court granted certiorari.

The Supreme Court first addressed whether Penry's claim was barred under *Teague. See generally Penry,* 492 U.S. at 313–19, 109 S.Ct. at 2943–47. One would think this was an easy case; granting Penry the relief he sought seemingly would have required the creation of a new rule insofar as it would have repudiated prior Fifth Circuit decisions. And, with those Fifth Circuit cases in the legal landscape, presumably a state court at the time his conviction became final would not have felt compelled to grant Penry the relief he sought. But the Supreme Court held that Penry's claim was not *Teague*-barred: He did not seek a new rule because he simply sought the application (not the extension) of a preexisting rule of law in a new factual setting. *See id.* at 314–15, 318–19, 109 S.Ct. at 2944–45, 2946–47.

[T]he facial validity of the Texas death penalty statute had been upheld in [*Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) ] on the basis of assurances that the special issues would be interpreted broadly enough to enable sentencing juries to consider all of the relevant mitigating evidence a defendant might present. Penry argues that those assurances were not fulfilled *in his particular case* because, without appropriate instructions, the jury could not fully consider and give effect to the mitigating evidence of his mental retardation and abused child-

hood in rendering its sentencing decision. . . . [I]n light of the assurances upon which *Jurek* was based, we conclude that the relief Penry seeks does not "impos[e] a new obligation" on the State of Texas.

*Id.* 492 U.S. at 318–19, 109 S.Ct. at 2946–47 (emphasis in original) (quoting *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070 (plurality opinion)). The *Jurek* rule created a standard which the Court simply applied to the facts of Penry's case, *i.e.,* to his mitigating evidence. *See Parks,* 494 U.S. at 492, 110 S.Ct. at 1262. Despite the fact that the *specific holding* announced in *Penry* was novel and repudiated prior Fifth Circuit decisions, Penry's claim was not *Teague*-barred because it did not impose a new obligation on the state; the state already was obligated to apply the *Jurek* standard. *Accord Stringer,* —— U.S. at —— – ——, 112 S.Ct. at 1135–40 (Court applying the principle announced in *Godfrey* ).

*Penry* thus demonstrates (and *Stringer* confirms) the critical distinction between the *extension* of an existing rule on collateral review and the mere *application* of an existing normative rule (such as *Godfrey/Cartwright* ) to a new set of facts.[10] *Cf. Stringer,* —— U.S. at ——, 112 S.Ct. at 1135. Our court too has recognized this distinction. In *West v. Wright,* 931 F.2d 262 (4th Cir.1991), *rev'd on other grounds,* —— U.S. ——, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992), the petitioner raised a sufficiency of the evidence challenge under *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The Commonwealth argued that granting the petitioner the relief he sought would have created a new rule in violation of *Teague. West,* 931 F.2d at 265. Specifically, the Commonwealth noted that, although *Jackson v. Virginia* came down before petitioner's conviction became final, a decision in his favor would have required our court to

---

10. *See Chambers v. United States* , 22 F.3d 939, 942 (9th Cir.1994) ("We do not create a new rule when we simply apply 'a rule of this general application,' *Wright v. West,* —— U.S. ——, ——, 112 S.Ct. 2482, 2499 (Kennedy, J., concurring), to a new set of facts." (citing *Stringer, supra* )); *Beam v. Paskett,* 3 F.3d 1301, 1310 (9th Cir.1993) ("As the Supreme Court has recently noted [in *Stringer* ], a rule is not 'new' simply because it is

applied to a set of different facts. Because we simply applied the general *Herndon* rule [holding that any limitation upon individual liberty must have an appropriate relation to the safety of the state] to the specific facts of this case, we conclude that our holding does not create a 'new' rule." (citation omitted)), *cert. denied sub nom. Arave v. Beam,* —— U.S. ——, 114 S.Ct. 1631, 128 L.Ed.2d 354 (1994).

disregard Virginia's common law permissive inference that one in unexplained possession of stolen goods is the thief. *Id.* We rejected the *Teague* challenge: "Obviously, a federal habeas court cannot be said to apply a 'new constitutional rule' whenever it applies the *Jackson v. Virginia* test to a 'new' set of facts in evidence." *Id.* at 266.[11]

■■■ A divided Supreme Court reversed our *West* decision on the merits after concluding there was sufficient evidence to support the petitioner's conviction under the *Jackson* standard; but the Court did not directly address the *Teague* issue. *See generally Wright v. West,* —— U.S. ——, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992).[12] However, in her concurring opinion, Justice O'Connor, the author of the plurality opinion in *Teague,* emphasized: "If a proffered factual distinction between the case under consideration and pre-existing precedent does not change the force with which the precedent's underlying principle applies, the distinction is not meaningful, and any deviation from precedent is not reasonable." *Id.* at ——, 112 S.Ct. at 2497 (O'Connor, J., concurring in the judgment). Justice Kennedy elaborated:

> If the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific applications without

saying that those applications themselves create a new rule. The rule of [*Jackson v. Virginia* ] is an example. By its very terms it provides a general standard which calls for some examination of the facts.... Where the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent.

*Id.* at ——, 112 S.Ct. at 2499 (Kennedy, J., concurring in the judgment); *see also Graham,* —— U.S. at ——, 113 S.Ct. at 918 (Souter, J., dissenting) (noting that "[o]ne general rule that has emerged under *Teague* is that application of existing precedent in a new factual setting will not amount to announcing a new rule").[13]

In sum, when we apply an extant normative rule to a new set of facts (leaving intact the extant rule) generally we do not announce a new constitutional rule of criminal procedure for purposes of *Teague.* To be sure, *Teague* is implicated "by the application of an old rule in a manner that was not dictated by precedent." *Stringer,* —— U.S. at ——, 112 S.Ct. at 1135; *cf. Butler,* 494 U.S. at 414–15, 110 S.Ct. at 1217–18. But when a rule provides a standard that of

---

**11.** *Accord Paradis v. Arave,* 20 F.3d 950, 953–54 (9th Cir.1994) (holding *Jackson v. Virginia* challenge is not barred by *Teague;* also holding that *Teague* did not bar application of either *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (due process requirement that a defendant be advised of all materials to be used against him in sentencing), or *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (Eighth Amendment rule requiring proportionate culpability for imposing death sentence)).

**12.** Justice Thomas wrote an opinion joined by two other Justices. Justice O'Connor wrote an opinion joined by two other Justices. Justices White, Kennedy and Souter each wrote concurring opinions, none of which were joined by other Justices.

**13.** This point was not lost on the second Justice Harlan, the father of our new rule jurisprudence. He emphasized that "it is necessary to determine whether a particular decision has really announced a 'new' rule at all or whether it has

*simply applied* a well-established *constitutional principle* to govern a case which is *closely analogous* to those which have been previously considered in the prior case law." *Desist v. United States,* 394 U.S. 244, 263, 89 S.Ct. 1030, 1041, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting) (emphases added); *see also Mackey v. United States,* 401 U.S. 667, 695, 91 S.Ct. 1160, 1181, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in judgments in part and dissenting in part). Other pre-*Teague* retroactivity cases similarly have highlighted this point. *See, e.g., Yates v. Aiken,* 484 U.S. 211, 216, 108 S.Ct. 534, 537, 98 L.Ed.2d 546 (1988) ("many 'new' holdings are merely applications of principles that were well settled at the time of conviction"); *United States v. Johnson,* 457 U.S. 537, 549, 102 S.Ct. 2579, 2587, 73 L.Ed.2d 202 (1982) ("[W]hen a decision of this Court merely has applied settled precedents to new and different factual situations, no real question has arisen as to whether the later decision should apply retrospectively. In such cases, it has been a foregone conclusion that the rule of the later case applies in earlier cases, because the later decision has not in fact altered that rule in any material way.").

necessity requires a case-by-case examination, generally the results yielded by that application are not "new rules" because those results do not "break[ ] new ground or impose[ ] a new obligation on the States or the Federal Government." *Teague*, 489 U.S. at 301, 109 S.Ct. at 1070 (plurality opinion); *cf. Penry*, 492 U.S. at 315, 319, 109 S.Ct. at 2945, 2947 (emphasizing that the application of the pre-existing rule at issue did not impose a new obligation on the state). Rather, the state courts presumably are aware of the pre-existing rule and it is foreseeable to them that the rule is to be applied.

■ Consequently, although comity interests would have us defer to a state court's determination that a petitioner seeks the expansion or extension of a pre-existing rule, *i.e.*, a new rule, reflexive deference is inappropriate when we are asked to review a state court's application of that rule to the specific facts of a new case. Otherwise, we would have to say that *Teague* altered the standard of review on habeas, which the Supreme Court declined to hold in *Wright v. West. See West*, —— U.S. at ——, 112 S.Ct. at 2497 (O'Connor, J., concurring in the judgment) ("In *Teague*, we refused to give state prisoners the retroactive benefit of new rules of law, but we did *not* create any deferential standard of review with regard to old rules."); *cf. Sawyer*, 497 U.S. at 239, 110

S.Ct. at 2830 ("Federal habeas corpus serves to ensure that state convictions comport with the *federal* law that was established at the time the petitioner's conviction became final.").[14]

We now return to the instant case. *Godfrey* held that state courts must supplement facially vague aggravating factors with "constitutionally sufficient," *Walton*, 497 U.S. at 655, 110 S.Ct. at 3058, limiting instructions or appellate review. *Godfrey* and *Cartwright*, like *Jackson v. Virginia*, set forth "a general standard which calls for some examination of the facts," *West*, —— U.S. at ——, 112 S.Ct. at 2499 (Kennedy, J., concurring in the judgment)—namely, examination of the language of the particular limiting instruction or the appellate review at issue. Although the state courts below may have relied on *Turner v. Bass*, *supra*, in concluding that the limiting construction of "aggravated battery" given to Turner's jury and applied on review was constitutionally sufficient, that conclusion is not subject to a deferential standard of review under *Teague*. To borrow the language from *Penry*, *Godfrey* upheld the statutory vileness factor on the basis of "assurances" that the sentencer's discretion would be channelled by constitutionally sufficient standards. Turner "argues that those assurances were not fulfilled *in his particular case* because, without appropriate instructions [or

14. We think Judge Luttig, in his opinion concurring in the judgment, overlooks the significance of *Wright v. West*. To reiterate, there the Court declined to hold that *Teague* established a deferential standard of review of state court decisions of federal law. *See West*, —— U.S. at ——, 112 S.Ct. at 2498 (Kennedy, J., concurring in the judgment) (*"Teague* did not establish a deferential standard of review of state court decisions of federal law."). Rather, the familiar standards still control: On federal habeas a state court's factual findings are "presumed to be correct," 28 U.S.C. § 2254(d), whereas its findings on questions of law and mixed questions of fact and law receive independent federal consideration, *Miller v. Fenton*, 474 U.S. 104, 115, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985). We believe that it is not a question of historical fact whether a state court has given a constitutionally sufficient limiting instruction for a vague aggravating factor or whether a state court has provided constitutionally sufficient appellate review of a sentence based a vague factor. Therefore, the sufficiency of the limiting instruction or appellate review is reviewed *de novo*.

Judge Luttig, however, suggests that so long as a reasonable state court jurist finds the instruction/appellate review at issue to be constitutionally sufficient (more accurately, if the jurist would not have felt compelled to find the instruction or review constitutionally insufficient), we defer to the state court's judgment. To us, this is contrary to *Miller* and *West. See West*, —— U.S. at ——, 112 S.Ct. at 2497 (O'Connor, J., concurring in the judgment) ("[W]e have [not] held in the past that federal courts must presume the correctness of a state court's legal conclusions on habeas, or that a state court's incorrect legal determination has ever been allowed to stand because it was reasonable. We have always held that federal courts, even on habeas, have an independent obligation to say what the law is."); *id.* at ——, 112 S.Ct. at 2499 (Kennedy, J., concurring in the judgment) ("The comity interest [underlying *Teague*] is not, however, in saying that since the question is close the state court decision ought to be deemed correct because we are in no better position to judge.").

appellate review, his sentencer's discretion could not be channelled by clear and objective standards].... [I]n light of the assurances upon which [*Godfrey*] was based, we conclude that the relief [Turner] seeks does not 'impos[e] a new obligation' on the State of [Virginia]." *See Penry*, 492 U.S. at 318–19, 109 S.Ct. at 2946–47 (quoting *Teague*, 489 U.S. at 301, 109 S.Ct. at 1077 (plurality opinion)).[15]

In the final analysis, we hold that, in challenging the Commonwealth's application of its vileness factor in his case, Turner does not "seek[ ] the benefit of a new rule," *Bohlen*, —— U.S. at ——, 114 S.Ct. at 953, for purposes of *Teague*. Accordingly, *Teague* does not bar us from reaching the merits.

**B. The Applicability of *Teague v. Lane* to Turner's Ineffective Assistance of Counsel Claims**

 Turner claims that his lawyers at the resentencing proceeding rendered ineffective assistance under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Although *Strickland*

was decided four years before Turner's conviction became final, the Commonwealth contends that Turner's *Strickland* claims are *Teague*-barred. The Commonwealth's *Teague* challenge is predicated on its view that, "under the facts of this case 'reasonable jurists reading the case law that existed' in 1988 could have concluded that defense counsel were not ineffective...." Appellee's Br. at 9. As noted above, *Teague* does not mandate deference to a state court's application of law to fact. *See generally Wright v. West*, *supra*. Rather, mixed questions of law and fact are subject to *de novo* review on habeas. *Miller v. Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 450–51, 88 L.Ed.2d 405 (1985). And, whether counsel rendered ineffective assistance is a mixed question of law and fact. *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070. *Teague* thus does not mandate deference to the Virginia courts' application of *Strickland* to the facts of Turner's case. We therefore reject the Commonwealth's argument that *Teague* bars us from reaching the merits of Turner's various ineffective assistance of counsel claims.[16]

---

**15.** Judge Luttig takes the position that a holding in Turner's favor "would, quite obviously, impose a 'new obligation' on the Commonwealth of Virginia," *post*, at 919–20 (citation omitted), but he says that the holding in *Penry* "vacating Penry's death sentence, and requiring an additional instruction that the jury could consider his mitigating evidence as such, did not 'impose a new obligation' on the State of Texas," *id.* at 911 n. 4 (citation omitted). According to Judge Luttig, *Penry* did not impose a new obligation because "such an obligation"—that the state could not foreclose altogether the sentencer's consideration of a defendant's mitigating evidence—"had already been imposed by prior law." *Id.* But in the instant case, as in *Penry*, there is an extant obligation imposed on the states: When a state uses a vague aggravating factor, the state's limiting instruction or appellate review must be constitutionally sufficient. *See supra* note 9. The question presented in *Penry* and the instant case is the same: has the state fulfilled its obligation. As Judge Luttig's discussion of *Penry* indicates, a federal court's finding that a state failed to fulfill an extant obligation does not necessarily impose a new obligation.

**16.** "Because *Teague* and its Supreme Court progeny ... have sent somewhat inconsistent signals, the circuit courts have had difficulty in coherently following those cases." 8C James W. Moore et al., *Moore's Federal Practice* § 14.06[4], App. 14–102.5 (2d ed.1994). Yet Judge Luttig tells us that the Supreme Court's new rule cases have been

consistent and clear. Despite that alleged consistency, his opinion is devoted in large measure to a discussion of but one case, *Graham v. Collins*, *supra*, a case which he says we have ignored. We have not ignored *Graham*. Rather, because we think the Court has not spoken in one clear voice, we have attempted to reconcile the Court's new rule cases. To that end, our attention was drawn to *Stringer* and *Penry*, the two new rule cases where the Court found no *Teague* problem. We think the instant case is more like *Stringer* and *Penry* than *Graham* and the Court's other new rule cases.

Before addressing the distinction between *Penry* and *Graham*, we pause to comment on Judge Luttig's assessment of *Stringer* as "an unexceptional application of the Court's consistently-applied standard," *post*, at 912–13. This would come as a surprise to the three *Stringer* dissenters. For one thing, *Stringer* held that *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), did not announce a new rule despite the fact that an earlier case, *Zant v. Stephens*, 462 U.S. 862, 890, 103 S.Ct. 2733, 2749–50, 77 L.Ed.2d 235 (1983), had expressly left undecided the constitutional issue decided in *Clemons*—whether in a "weighing" state the state court must reweigh aggravating factors against mitigating evidence if one of the aggravating factors used by the sentencer is held to be invalid. The *Stringer* dissenters were thus baffled about how a reasonable jurist at the time

Clemons's conviction became final could have felt compelled to conclude that the result in *Clemons* was dictated by precedent when precedent (*Stephens*) expressly left the issue undecided. *See Stringer*, —— U.S. at ——, 112 S.Ct. at 1144 (Souter, J., dissenting).

More significant is the *Stringer* majority's response to the dissent's insistence that the result in *Clemons* was not dictated by extant case law.

> When the weighing process itself has been skewed, only constitutional harmless-error analysis or reweighing at the trial or appellate level suffices to guarantee that the defendant received an individualized sentence. This clear principle *emerges not from any single case*, as the dissent would require, . . . *but from our long line of authority setting forth the dual constitutional criteria of precise and individualized sentencing.*

*Id.* —— U.S. at ——, 112 S.Ct. at 1137 (emphasis added). In other words, although the result in *Clemons* was not dictated by a particular case, *Clemons* did not announce a new rule because the result "emerged" from the principle that sentencing must be "precise and individualized." We think this is a less restrictive standard than that employed in *Graham* (and endorsed by Judge Luttig) and consequently we disagree with Judge Luttig's position that *Stringer* was a run-of-the-mill *Teague* case.

Moving on to the relationship between *Penry* and *Graham*, we are not persuaded by how Judge Luttig has reconciled the two cases. The cases are distinguishable: *Penry* involved the application of a pre-existing rule to a new set of facts, whereas *Graham* involved a petitioner seeking the benefit of a brand new rule of law, *i.e.*, an extension of a pre-existing rule. Specifically, in *Penry* the Court applied to Penry's facts the preexisting rule set forth in the *Jurek/Lockett/Eddings* line of cases—relevant mitigating evidence must not be placed beyond the effective reach of the sentencer. However, as Judge Luttig observes, *Graham's* evidence was not placed beyond the sentencer's reach. *See post*, at 910–11 ("Penry's jury was not, but Graham's was, permitted to consider mitigating evidence as such. . . ."). Graham argued that under the Texas scheme a defendant is entitled to special instructions whenever he can offer mitigating evidence that has some arguable relevance beyond Texas's "special issues." *See id.* at 911 n. 4 ("Vacating Graham's death sentence, by contrast, would have required a holding that Texas could not channel the effect of a defendant's mitigating evidence at all."). Graham thus sought more than the application of a pre-existing rule; he sought an extension of the *Jurek/Lockett/Eddings* line of cases (and thus sought the benefit of a whole new rule).

Of course, as Judge Luttig observes, *see id.* at 909, Graham thought he sought merely the application of a pre-existing rule. But at best, what Graham actually sought was the application of pre-existing *principles* (those underlying the *Jurek/Lockett/Eddings* line of cases). In short, Graham's problem was that he invoked a pre-

existing rule at too high a level of generality. As Justice Souter has observed:

> The crux of the analysis when *Teague* is invoked . . . is identification of the rule on which the claim for habeas relief depends. To survive *Teague*, it must be . . . specific enough to dictate the rule on which the conviction may be held to be unlawful. . . . [P]assing on its requisite specificity calls for analytical care.

*West*, —— U.S. at ——, 112 S.Ct. at 2501 (Souter, J., concurring in the judgment). Because it is our legal tradition that developments in the law be guided by extant principles, virtually every habeas petitioner will contend that a general principle, *e.g.*, that the death penalty not be "arbitrarily and capriciously" inflicted, dictates the rule he seeks. *Teague* would be meaningless if habeas petitioners could benefit from the application of pre-existing rules at too high a level of generality. *Sawyer*, 497 U.S. at 236, 110 S.Ct. at 2828.

Judge Luttig in essence charges us with applying *Godfrey* at too high a level of generality. Under his reading of *Godfrey*, a jury instruction on an aggravating factor can be reviewed on habeas in only two situations: (1) where, as in *Godfrey*, a jury is given the bare terms of a "vague" aggravating factor, and (2) where, as in *Cartwright*, a jury is given a limiting construction which gives "'no more guidance than did the statute in *Godfrey*,'" *post*, at 915 (quoting *Stringer*, —— U.S. at ——, 112 S.Ct. at 1135), *i.e.*, where the "instruction provide[s] no limitation whatsoever on the jury's discretion," *id.* But how do we know whether a limiting instruction provides "no more guidance" or "no limitation whatsoever"? To find out, we must review the factor or limiting construction to assess its constitutional sufficiency. *See supra* note 9 (discussing *Walton v. Arizona* (non-habeas case) and *Lewis v. Jeffers* (habeas case)). Yet Judge Luttig takes us to task for conducting this "full merits review," *post*, at 904. Put another way, Judge Luttig seems to say that review of the constitutional sufficiency of a limiting construction (*i.e.*, a review on the merits) is not *Teague*-barred if the limiting construction is constitutionally insufficient, which we would not know unless we undertook a review on the merits, which Judge Luttig says we are barred from doing.

We are no less intrigued by Judge Luttig's conclusion that Turner's ineffective assistance claims are not *Teague*-barred. Judge Luttig vehemently stresses that "*Teague* bars consideration of a claim where the defendant could not even prevail on the merits," *id.* at 911, and that "avoidance of a new rule is possible only where the prior precedent resolves the case in the petitioner's favor," *id.* at 911. Yet he concludes that *Teague* does not bar consideration of Turner's ineffective assistance claims, *see id.* at 84 n. 14, despite the fact that Turner does not prevail on the merits of these claims. Put another way, Turner's constitutional challenges to his lawyers' performance are not *Teague*-barred even though reasonable jurists would not have felt compelled to conclude that Turner's lawyers were constitutionally deficient. (For example, reasonable ju-

III

The Commonwealth next contends that Turner procedurally defaulted on most of his claims. First, it says he procedurally defaulted on his challenges to the application of the statutory vileness factor because the Supreme Court of Virginia found these claims procedurally defaulted. *See Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (generally, when a habeas petitioner has defaulted on a federal claim in state court pursuant to an independent and adequate state procedural rule, federal review of the defaulted claim is barred); *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). Second, it says he procedurally defaulted on one of his ineffective assistance claims (challenging counsel's failure to put on mitigating evidence described in the opening statement) because it was never raised in the state courts. *See Bassette v. Thompson,* 915 F.2d 932, 936–37 (4th Cir.1990) (ineffective assistance claims not raised on state habeas are procedurally de-

faulted) (citing *Teague,* 489 U.S. 297–99, 109 S.Ct. at 1068–69), *cert. denied,* 499 U.S. 982, 111 S.Ct. 1639, 113 L.Ed.2d 734 (1991). We will address the Commonwealth's procedural default arguments in turn and ultimately conclude that Turner has not procedurally defaulted on these claims.

A. *Challenges to the Application of the Vileness Factor*

Turner challenges the application of the vileness factor in several respects. In overlapping arguments, he says (1) the limiting definitions (instructions) for "aggravated battery" and "depravity of mind" were constitutionally insufficient, (2) the Supreme Court of Virginia's direct review of his sentence was inadequate, (3) the facts of the Smith murder do not support the vileness factor, and (4) the Supreme Court of Virginia generally does not provide capital defendants with meaningful appellate review. These various allegations were scattered throughout claims VII and XIV of Turner's state habeas petition.[17]

rists would not have felt compelled to conclude that it was necessarily ineffective assistance to inform a venire that a petitioner was previously sentenced to death by a different jury for the same crime.)

In the final analysis, and contrary to Judge Luttig's suggestions, we have not "alter[ed] for this circuit the Supreme Court's 'new rule' jurisprudence," *id.* at 904, nor have we "disregard[ed] ... Supreme Court authority," *id.* at 905. At bottom, we disagree with Judge Luttig that there is an "unambiguous directive," *id.* at 910, in the Supreme Court's new rule cases. Most of the Court's new rule cases were five-to-four decisions with shifting majorities. Indeed, in *Wright v. West,* Justice O'Connor, the author of the *Teague* plurality opinion, issued an opinion (joined by two Justices) in which she attempted to define what constitutes a new rule, *see West,* —— U.S. at ——, 112 S.Ct. at 2497 (O'Connor, J., concurring in the judgment); Justice Thomas's opinion (also joined by two Justices) "disagree[d], however, with Justice O'Connor's definition of what constitutes a 'new rule' for *Teague* purposes." *Id.* —— U.S. at —— n. 8, 112 S.Ct. at 2490 n. 8 (plurality opinion).

We have not created a new standard today. We hold simply that the application of a preexisting normative rule, a rule which by its nature contemplates prospective application, generally is not *Teague*-barred. Hence our *dictum* that *Godfrey* "dictates Turner's challenge," *supra* p. 881; *cf. supra* p. 882, for the challenge is simply the application of the preexisting rule. And notwithstanding Judge Luttig's parade of horribles, our decision will not "render reviewable on *ha-*

*beas* essentially every claim," *post,* at 908. *Teague* controls when a petitioner does not seek the application of an old rule or when a petitioner seeks to apply an old rule in a manner not dictated by precedent, "thereby extending the precedent." *Stringer,* —— U.S. at ——, 112 S.Ct. at 1135. We, to be sure, do "recognize[ ] the inevitable difficulties that will arise in attempting to determine whether a particular decision has really announced a new rule at all or whether it has simply applied a well-established constitutional principle to govern a case which is closely analogous to those which have been previously considered in the prior case law." *Penry,* 492 U.S. at 314, 109 S.Ct. at 2944 (internal quotation marks omitted) (quoting *Mackey v. United States,* 401 U.S. 667, 695, 91 S.Ct. 1160, 1181, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in judgments in part and dissenting in part), in turn quoting *Desist v. United States,* 394 U.S. 244, 263, 89 S.Ct. 1030, 1041, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting)); *see also Graham,* —— U.S. at ——, 113 S.Ct. at 918 (Souter, J., dissenting) ("it can be a difficult question whether a particular holding presents simply a new setting for an old rule, or announces a new one"). This difficulty, however, must be attributed to *Teague* and its progeny, not to us.

17. In claim VII he argued that there was an insufficient factual basis to find depravity of mind or an aggravated battery. In claim XIV he argued that the vileness factor was vague on its face, that the limiting definitions of "aggravated battery" and "depravity of mind" also were

The Supreme Court of Virginia, on collateral review, held that these claims were procedurally defaulted, stating:

> Applying the rule in *Slayton v. Parrigan*, 215 Va. 27, 205 S.E.2d 680 (1974) . . . to the extent allegations numbered VII, VIII, XIV, XV, and XVI in his petition for writ of habeas corpus advance matters not asserted on direct appeal; and, applying the rule in *Hawks v. Cox*, 211 Va. 91, 175 S.E.2d 271 (1970), to allegations [VII, VIII, XIV, XV, and XVI] . . . to the extent that they advance matters asserted on direct appeal, the petition for appeal is denied for reasons of procedural default.

*Turner v. Williams*, No. 901335 (Va. Apr. 30, 1991). *Slayton* generally says that claims that could have been raised on direct appeal, but were not, cannot be raised on state collateral review. *Slayton*, 205 S.E.2d at 682. *Hawks* has been read to say that claims raised and decided against petitioner on direct review cannot be raised on state habeas. *See Hawks*, 175 S.E.2d at 274. Thus, the Supreme Court of Virginia dismissed these claims either because they were raised and decided on direct appeal (*Hawks*) or because they were not raised on direct appeal (*Slayton*).

■ *Slayton* is a valid procedural default rule. *Smith v. Murray*, 477 U.S. 527, 533–39, 106 S.Ct. 2661, 2665–69, 91 L.Ed.2d 434 (1986). *Hawks*, however, is not a true procedural default rule; rather, it is more in the nature of a collateral estoppel rule. *Hawks* cannot prevent federal habeas review of federal constitutional claims properly raised on direct appeal. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–07, 111 S.Ct. 2590, 2595–96, 115 L.Ed.2d 706 (1991). Thus, we must ascertain whether Turner raised on direct appeal the aforementioned challenges to the application of the vileness factor. If he did, he is not procedurally barred from raising them here.

■ In his brief to the Supreme Court of Virginia on direct appeal, Turner argued that the murder of Smith was not vile, *i.e.*, that the murder involved neither depravity of mind nor an aggravated battery. He also

argued that imposition of the death sentence for the murder of Smith would be disproportionate to the crime when viewed in comparison to other cases where the death sentence was predicated solely on the vileness factor. Moreover, he attacked the vileness factor (and the Virginia death penalty statute) on its face as being unconstitutionally vague and overbroad.

As for the sufficiency of the limiting definitions given to his jury, Turner's brief on direct appeal contained a subsection entitled: "This Court must adopt stricter standards for defining and applying the vileness aggravating circumstance." JA 553. In this subsection, Turner argued:

> This Court should make clear that an aggravated battery must be one which, qualitatively and quantitatively, is *much more vile than* the minimum necessary to accomplish the act of murder, and that "depravity of mind" is a degree of moral turpitude and psychical debasement that *far* surpasses that inherent in the definition of legal malice and premeditation.

JA 553–54 (emphases in original). The highlighted portions above represented his suggested modifications to the limiting definitions given to his jury; without those modifications, he argued, the instructions were constitutionally deficient. *See Turner*, 364 S.E.2d at 488 n. 2 ("Turner argues that we must apply stricter standards for determining 'vileness' or else face the risk of having the present standards declared unconstitutional. We reject this argument.").

Finally, as for Turner's attack on Virginia's *system* of appellate review generally, Turner listed as one of ten questions presented on direct appeal: "3. Does this Court provide adequate appellate review of death sentences?" JA 544. Listed as an assignment of error was an allegation "[t]hat the failure of the Virginia courts to afford adequate appellate review of death sentences means that death sentences are being imposed in Virginia in an arbitrary and capricious manner, in violation of the Eighth and Four-

vague, and that the Virginia Supreme Court's appellate review was deficient both generally and in his case.

teenth Amendments to the United States Constitution." JA 545.[18]

In sum, Turner's various challenges to the application of the vileness factor were raised on direct appeal and therefore the Supreme Court of Virginia (on collateral review) must have dismissed these claims under *Hawks*, not *Slayton*. Accordingly, because *Hawks* does not bar us from reviewing the merits of federal constitutional claims properly raised on direct appeal, we reject the Commonwealth's argument that Turner is procedurally barred from raising these claims on federal habeas.

### B. Ineffective Assistance Challenge

■ We also reject the Commonwealth's argument that Turner procedurally defaulted on his ineffective assistance claim arising from counsel's failure to put on the mitigating evidence described in the opening statement. Turner's state habeas petition alleged that "[c]ounsel failed to present mitigating evidence ... despite defense counsel's opening statement to the jury that several witnesses would testify on Mr. Turner's behalf." JA 591. The state habeas court held an evidentiary hearing in part to address counsel's failure to put on mitigating evidence. After the hearing, Turner submitted to the court proposed findings of fact and conclusions of law, wherein he argued that the "broken promises made by Mr. Snook to the jury in his opening statement" were "independently prejudicial." JA 1315. He continued:

> "We cannot but conclude that to promise even a condensed recital of such powerful evidence, and then not produce it, could not be disregarded as harmless. *We find it prejudicial as [a] matter of law.*" *Anderson v. Butler,* 858 F.2d 16, 19 (1st Cir.1988) (emphasis added). In that case, the Court of Appeals reversed the district court's denial of habeas corpus based on facts nearly identical to those here.

*Id.; see also* JA 1397. The Commonwealth responded to this argument in its proposed findings of fact and conclusions of law. JA 1432 (¶ 26). Then, in his (habeas) Petition For Appeal to the Supreme Court of Virginia, Turner argued:

> Even if counsel knew that he could keep his promises (as Mr. Snook could not have known), it still would be "prejudicial as [a] matter of law" to "promise even a condensed recital of such powerful evidence, and then not produce it." *Anderson v. Butler,* 858 F.2d 16, 19 (1st Cir.1988).

JA 1595–96 (footnotes omitted). In an accompanying footnote, Turner noted that "[o]ther courts have found counsel ineffective based in part on the failure to deliver evidence promised in opening statements." JA 1596.

We conclude that Turner has fairly presented this ineffective assistance claim in the state collateral proceedings and therefore hold that he is not barred from raising it on federal habeas. Having concluded that Turner's claims are not procedurally barred, we now turn to the merits.

### IV

As noted above, Turner raises numerous challenges to the application of the vileness factor, several of which are interrelated.

■ He first says the jury instructions inadequately defined the vileness factor. More particularly, he says that the limiting definitions for "aggravated battery" and "depravity of mind" were constitutionally insufficient. The jury was instructed that "an aggravated battery is a battery which qualitatively and quantitatively is more culpable than the minimum necessary to accomplish an act of murder." JA 517–P. The jury also was instructed that "depravity of mind is a degree of moral turpitude and and [sic] psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation." JA 517–Q. The court fur-

---

**18.** Of course, Turner's challenge to the appellate review of his own sentence could not have been raised on direct appeal, because appellate review had yet to take place (though he did argue in his brief on direct appeal: "If this Court fails to reverse the jury's verdict, the Court will have failed to provide adequate appellate review of the propriety of the death sentence." JA 547). This claim was raised in his state habeas petition and in his habeas Petition for Appeal to the Supreme Court of Virginia and therefore was properly exhausted.

ther defined malice and premeditation. Turner says that these definitions are incomprehensible and that they fail to narrow the class of persons eligible for the death penalty. *See Arave v. Creech,* —— U.S. ——, ——, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993) (the language of a limiting construction must be determinate and "must 'genuinely narrow the class of persons eligible for the death penalty'" (quoting *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983))).

We have on several occasions upheld limiting definitions that were identical or virtually identical to those challenged here. *See, e.g., Jones,* 976 F.2d at 174–75 (holding that identical limiting definitions of depravity of mind and aggravated battery "were specific and provided adequate guidance to the jury" as required by *Godfrey*). Recognizing that "the proper degree of definition of an aggravating factor of this nature is not susceptible of mathematical precision," *Walton,* 497 U.S. at 655, 110 S.Ct. at 3058, we believe the limiting definitions here are sufficiently clear and objective. And, as we have previously observed, the limiting definitions adequately narrow the class of persons eligible to receive the death penalty because a juror of ordinary sensibility would not find that all murders involve depravity of mind or an aggravated battery. "The instructions clearly direct the jury away from that result by requiring that something extra be present, *i.e.,* either force greater 'than the minimum necessary to accomplish an act of murder' or 'a degree of psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation.'" *Jones,* 976 F.2d at 174–75. We therefore reaffirm our prior holdings, which we think are amply supported by the Supreme Court's recent decision in *Creech.*

In *Creech,* the death sentence was based in part on Idaho's utter disregard factor: "[b]y the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life." —— U.S. at ——,

113 S.Ct. at 1538 (quoting Idaho Code § 19–2515(g)(6) (1987)). Idaho had adopted a limiting construction, whereby the utter disregard factor was "meant to be reflective of acts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, i.e., the cold-blooded, pitiless slayer." *Id.* at ——, 113 S.Ct. at 1539. The Supreme Court held that this construction satisfied constitutional requirements. *Id.* at ——, 113 S.Ct. at 1541. Surely the limiting construction applied in Turner's case is as clear and objective as, and satisfies the narrowing requirement as well as, the construction upheld in *Creech. See also Walton,* 497 U.S. at 654, 110 S.Ct. at 3057–58 (upholding Arizona court's limiting construction which said a murder was "especially cruel" if "the perpetrator inflicts mental anguish or physical abuse before the victim's death," with mental anguish including "a victim's uncertainty as to his ultimate fate") (internal quotation marks omitted); *compare Shell v. Mississippi,* 554 So.2d 887, 905–06 (Miss.1989), *rev'd per curiam,* 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) (holding unconstitutional a limiting construction of Mississippi's heinousness factor); *Cartwright,* 822 F.2d at 1488, *aff'd,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) (holding unconstitutional a limiting construction of Oklahoma's heinousness factor).[19]

■■■ Turner also claims that the Supreme Court of Virginia's appellate review of his sentence was inadequate because that court "allowed the death sentence to stand even though ... the crime was less culpable than the conduct in other death penalty cases or in many cases in which the defendant was sentenced to life imprisonment." Appellant's Br. at 50. He further "argues that the Virginia system does not provide capital defendants meaningful appellate review, even in cases in which the results appear arbitrary." *Id.* at 57. However, because we have held that the Virginia courts applied a constitutionally sufficient limiting construction for

---

19. According to Turner, *Godfrey* says that an aggravated battery requires "evidence of serious physical abuse of the victim before death." Appellant's Br. at 48 (quoting *Godfrey,* 446 U.S. at 431, 100 S.Ct. 1759 (plurality opinion)). We disagree. We agree instead with the district court below that Turner misreads Justice Stewart's plurality opinion. *See Turner,* 812 F.Supp. at 1423 n. 31.

the vileness factor in Turner's case, it is clear from the Supreme Court's cases that these additional claims carry no constitutional weight. For instance, in *Walton, supra,* the Supreme Court upheld the state court's limiting construction and then disposed of arguments similar to those raised by Turner here:

> Walton nevertheless contends that the heinous, cruel, or depraved factor has been applied in an arbitrary manner and, as applied, does not distinguish his case from cases in which the death sentence has not been imposed. In effect Walton challenges the proportionality review of the Arizona Supreme Court as erroneous and asks us to overturn it. This we decline to do, for we have just concluded that the challenged factor has been construed by the Arizona courts in a manner that furnishes sufficient guidance to the sentencer. This being so, proportionality review is not constitutionally required, and we "lawfully may presume that [Walton's] death sentence was not 'wantonly and freakishly' imposed—and thus that the sentence is not disproportionate within any recognized meaning of the Eighth Amendment."

497 U.S. at 655–56, 110 S.Ct. at 3058–59 (quoting *McCleskey v. Kemp,* 481 U.S. 279, 306, 308, 107 S.Ct. 1756, 1774–75, 1775, 95 L.Ed.2d 262 (1987)); *see also Lewis v. Jeffers,* 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) ("Our decision in *Walton* thus makes clear that if a State has adopted a constitutionally narrow construction of a facially vague aggravating circumstance, and if the State has applied that construction to the facts of the particular case, then the 'fundamental constitutional requirement' of 'channeling and limiting ... the sentencer's discretion in imposing the death penalty,' has been satisfied." (citation omitted) (quoting *Cartwright,* 486 U.S. at 362, 108 S.Ct. at 1858)); *Creech,* ―― U.S. at ――, 113 S.Ct. at 1544 ("our decisions do not authorize review of state court cases to determine whether a limiting construction has been *applied* consistently").

■ In any event, the Supreme Court of Virginia's review of Turner's sentence was adequate. The court found that the evidence was sufficient to trigger the vileness factor. *See Turner,* 364 S.E.2d at 488–89. Moreover, pursuant to Virginia law, the court determined that the sentence (1) was not "imposed under the influence of passion, prejudice or any other arbitrary factor," and (2) was not "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *Id.* at 490 (quoting Va.Code Ann. § 17–110.1(C) (Michie 1992)). The court conducted a proportionality review based on the records of all Virginia capital felony cases and found that Turner's murder was "just as brutal" as the murders in other cases where the death sentence was imposed. *Id.* The court concluded "that juries in this jurisdiction generally approve of the death penalty for offenses comparable to the murder committed by Turner." *Id.* at 491 (citing *Barnes v. Commonwealth,* 234 Va. 130, 360 S.E.2d 196, 203 (1987) ("vileness" found in murder of store employee shot three times during struggle with robber; *Barnes* held "that a killing inflicted by multiple gunshot wounds may constitute an 'aggravated battery' ... where there is an appreciable lapse of time between the first shot and the last, and where death does not result instantaneously from the first"), *cert. denied,* 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988)). In short, the Supreme Court of Virginia "plainly undertook its proportionality review in good faith," and "[t]he Constitution does not require us to look behind [its] conclusion." *Walton,* 497 U.S. at 656, 110 S.Ct. at 3058.

Turner's general attack on the Virginia system of appellate review is equally unpersuasive; the Virginia system does provide for meaningful review and its results are fairly consistent.[20]

---

20. In support of his argument that the Virginia Supreme Court arbitrarily applied the vileness factor in his case, Turner provides a litany of cites to Virginia death penalty cases which, according to him, involved murders with "significantly greater brutality" than his. Appellant's Br. at 54. But these cases go to demonstrate that Virginia consistently reserves the vileness factor for the most gruesome facts, thereby deflating his argument that Virginia imposes the death penalty in an arbitrary and capricious manner.

Turner's final claim is that, even if the vileness factor has been constitutionally defined, the facts of his case do not fit within that factor, *i.e.*, the vileness factor does not apply to him. A challenge to a state court's application of an aggravating factor, however, raises primarily a question of state law: "[F]ederal habeas review of a state court's application of a constitutionally narrowed aggravating circumstance is limited, at most, to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation." *Jeffers*, 497 U.S. at 780, 110 S.Ct. at 3102. "A state court's finding of an aggravating circumstance in a particular case ... is arbitrary or capricious if and only if no reasonable sentencer could have so concluded." *Id.* at 783, 110 S.Ct. at 3103. The "standard of review is the 'rational factfinder' standard established in *Jackson v. Virginia.*" *Id.* at 781, 110 S.Ct. at 3101–02; *see also Creech*, ___ U.S. at ___, 113 S.Ct. at 1544; *Richmond v. Lewis*, ___ U.S. ___, ___, 113 S.Ct. 528, 536, 121 L.Ed.2d 411 (1992).

We conclude that a rational sentencer could have found that the murder of Smith involved either depravity of mind or an aggravated battery. Turner emphasizes that his murder cannot possibly be considered an aggravated battery because he rapidly fired two successive shots into Smith's chest, either one of which may have been fatal. However, Turner shot Smith in the head before he fired the two shots into Smith's chest. And, between the shot to the head and the shots to the chest, enough time elapsed for Officer Bain to talk to Turner and for two customers to escape from the store. As the Supreme Court of Virginia emphasized on direct review in *Turner I*: "After being wounded [in the head] by Turner, Smith slumped helplessly behind the counter. Unlike Godfrey's victims, Smith did not die instantaneously from a single discharge of a firearm." *Turner*, 273 S.E.2d at 45. Thus, a rational factfinder could have found an aggravated battery here and therefore we reaffirm our conclusion in *Turner I*,

where "[w]e reject[ed] Turner's contention that his crime was not so vile as to justify the imposition of death." *Turner*, 753 F.2d at 353.

In sum, we hold that the vileness factor was constitutionally applied in Turner's case.

## V

Turner contends that his appointed lawyers, J. Lloyd Snook, III and Thomas L. Woodward, Jr., rendered ineffective assistance.[21] He challenges Snook's assistance in six respects: (1) his investigation of mitigating evidence, (2) his supervision and preparation of the mental health expert, (3) his failure to interview prosecution witnesses, (4) his informing the venire that a prior jury sentenced Turner to death for the same crime, (5) his failure to present any mitigating evidence, and (6) his failure to put on the evidence described in the opening statement.

We evaluate ineffective assistance claims under the standard set forth in *Strickland v. Washington, supra.* Under *Strickland*, an ineffective assistance claim has two components. First, defendant must show that counsel's performance was deficient, *i.e.*, "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88, 104 S.Ct. at 2064–65. Second, defendant must show that he was prejudiced by the deficient performance. *Id.* at 687, 104 S.Ct. at 2064. When a defendant challenges a death sentence, prejudice is established when "there is a reasonable probability that, absent [counsel's] errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S.Ct. at 2069. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. As explained below, we conclude

---

21. Woodward served in a limited capacity as Snook's co-counsel. Turner's challenges are directed in large measure against Snook. In discussing Turner's claims, we will refer to Snook unless otherwise appropriate.

that Turner has not carried his burden under *Strickland*.[22]

## A. Pretrial Preparation

### 1. Investigation of Mitigating Evidence

Turner argues that Snook inadequately investigated, or failed to investigate, certain mitigating evidence, namely evidence relating to (a) his background and (b) his role in a 1984 death row escape from Mecklenburg Correctional Center. His allegations focus on Snook's performance during the five-month period between Snook's July 31, 1986, appointment and the January 1987 resentencing proceeding. Viewing this period in isolation, we agree Snook spent relatively little time investigating and developing mitigating evidence. However, we cannot ignore the fact that he was not a blank slate when he was appointed in July 1986. Quite the contrary. Snook had been working on Turner's case since 1980, when he was appointed to represent Turner on direct appeal in *Turner I*. Snook represented him in the *Turner I* state and federal habeas proceedings, including Turner's victory in the United States Supreme Court in *Turner v. Murray, supra.* By the time of the resentencing hearing, Snook had devoted approximately 1,000 hours to Turner's case, including approximately 250 hours after the July 1986 appointment. (Woodward, moreover, began working on Turner's case in 1979, when he was appointed to serve as co-counsel in the *Turner I* murder trial and capital sentencing proceeding.)

Snook thus was knowledgable about Turner's case when he was reappointed in 1986. More importantly, Snook was aware of the mitigating evidence that had been developed for the *Turner I* capital sentencing proceeding and related collateral proceedings. At the original sentencing proceeding, for instance, several mitigation witnesses testified, including a psychiatrist and Turner's mother, aunt and first cousin. More significant was the evidence developed during the federal habeas phase of *Turner I*. There, ironically, Snook attempted to show that Turner's trial counsel rendered ineffective assistance for inadequately investigating mitigating evidence. In order to advance that claim, Snook necessarily had to develop additional mitigating evidence. He delegated that task to Marie Deans, the Executive Director of the Virginia Coalition on Jails and Prisons (an organization that, *inter alia*, assisted attorneys handling capital trials and appeals). Deans had assisted with many capital cases.

Deans interviewed by telephone (on multiple occasions) Turner's sister and uncle, neither of whom testified at the original sentencing trial. She also interviewed numerous other potential character witnesses. Deans then prepared reports for Snook that highlighted the results of her investigation. These reports provided part of the substance for a motion to alter or amend judgment filed in federal court in 1984.

Another development in 1984 was Turner's involvement in the escape of death row inmates from Mecklenburg Correctional Center; although Turner did not escape, he was involved in the planning and execution of the breakout. Snook had five clients on death row at Mecklenburg at the time. Within a week after the escape, he went to Mecklenburg to conduct an investigation. He may have spoken with as many as ten guards and inmates (including Turner) with firsthand knowledge of the escape, and Deans "had talked with a bunch more." JA 1291. Snook also spoke with officials at the Attorney General's Office and the Governor's Office, the head of the Corrections Board, and the Director of the National Prison Project of the American Civil Liberties Union, all of whom were involved in the investigation of the incident. Furthermore, he was present when Turner was interviewed by the police shortly

---

22. The state habeas court held an evidentiary hearing (the "state habeas hearing") on Turner's ineffective assistance claims. Although a state court's findings of historical fact are presumed correct under 28 U.S.C. § 2254(d), see *supra* note 14, Turner argues that we should not defer to the state habeas court's findings here because the court adopted verbatim the Commonwealth's proposed findings of fact. Providing examples, he further maintains that the record does not support many of these findings. We think these examples either are insignificant or involve conclusions drawn from historical facts. In any event, we have conducted an independent review of the record, and we are satisfied that counsel rendered effective assistance.

after the incident. As a result of these efforts, Snook had in his possession prior to resentencing a comprehensive file relating to the 1984 Mecklenburg escape, and he was aware of potential mitigating and aggravating testimony.

In sum, by the time of his appointment in July 1986, Snook generally was familiar with Turner's potential mitigating evidence. With this background in mind, we address Turner's challenge to the adequacy of Snook's pretrial investigation.

### a. Background evidence

Turner first challenges Snook's investigation of evidence relating to his early and formative years, alleging that Snook (i) failed to conduct face-to-face interviews or meet personally with potential defense witnesses prior to the resentencing proceeding (they met after the proceeding was underway), (ii) failed to contact other persons who might have had knowledge about Turner's early and formative years, and (iii) failed to conduct an adequate interview of Turner.

■■ As for Snook's failure to conduct face-to-face (as opposed to telephone) interviews or meet personally with defense witnesses prior to the resentencing proceeding, Snook did not deem such meetings necessary because he generally was familiar with the substance of what these witnesses would say. For instance, he had reviewed a number of times the potentially mitigating evidence that Deans had collected. In addition, he had telephoned potential defense witnesses the month before the resentencing proceeding. Although face-to-face meetings with witnesses may be the more desirable approach, we cannot say that Snook's performance was unreasonable. See Burger v. Kemp, 483 U.S. 776, 794, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987) ("[Counsel] could well have made a more thorough investigation than he did. Nevertheless, in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" (quoting United States v. Cronic, 466 U.S. 648, 665 n. 38, 104 S.Ct. 2039, 2050 n. 38, 80 L.Ed.2d 657 (1984))). Moreover, Turner fails to explain what additional evidence would have been obtained from face-to-face interviews or meetings. See Bassette, 915 F.2d at 940–41 (when challenging the adequacy of counsel's investigation, defendant must show what an "adequate" investigation would have uncovered).

■■ As for Snook's failure to contact more people familiar with Turner's background, counsel's duty to investigate is limited to a reasonable investigation. Strickland, 466 U.S. at 691, 104 S.Ct. at 2066. "Particularly when evaluating decisions not to investigate further, we must regard counsel's choices with an eye for 'reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments.'" Bunch v. Thompson, 949 F.2d 1354, 1363 (4th Cir. 1991) (quoting Strickland, 466 U.S. at 691, 104 S.Ct. at 2066), cert. denied, — U.S. ——, 112 S.Ct. 3056, 120 L.Ed.2d 922 (1992). As noted above, the list of individuals previously approached at one time or another for background information included Turner's mother (his father was deceased), his sister, his aunt, his uncle and his first cousin. It was not unreasonable for Snook to think he (and Deans) had identified and contacted those individuals most likely to possess potentially mitigating information.

Moreover, Turner has not demonstrated that he was prejudiced by Snook's failure to contact other individuals. He presents affidavits of several unapproached persons who knew about Turner's parents or the conditions of Turner's childhood, but the substance of these affidavits is cumulative of that which Snook already knew; for example, Turner's family was poor and his parents abused him. See Jones v. Murray, 947 F.2d 1106, 1113 (4th Cir.1991), cert. denied, — U.S. ——, 112 S.Ct. 1591, 118 L.Ed.2d 308 (1992); Bunch, 949 F.2d at 1365. And, to the extent Turner generally claims that additional sources should have been investigated (e.g., neighbors, teachers, friends), "he does not advise us of what an adequate investigation would have revealed or what these witnesses might have said, if they had been called to testify." Bassette, 915 F.2d at 940–41.

■ Finally, as for Snook's alleged failure to have a "comprehensive" conversation with Turner about his background, we note that, although Snook testified that he did not recall having a conversation with Turner "starting off with childhood and going all the way through the present," he and Turner "talked a fair amount," discussing "bits and pieces" of Turner's life history "from time to time." JA 755. Indeed, between the time of his original appointment in 1980 and the resentencing proceeding, Snook visited Turner a number of times and spoke with him by phone an average of once per month. They specifically discussed Turner's history while preparing his affidavit for filing in federal court in 1984. Moreover, Woodward had previously interviewed Turner at length. And, Deans (to whom Snook had assigned the task of gathering mitigating evidence) spoke with Turner in person (at Mecklenburg) about three times per year and by telephone about once or twice per month over a period of years. In view of the frequency of direct and indirect client contact, we decline to hold that Snook inadequately interviewed Turner. Nor has Turner shown how he was prejudiced, for he fails to advise us what additional information would have been uncovered by a "comprehensive" interview.

In sum, although Snook "could have perhaps investigated the facts of the case more thoroughly and with more diligence," *Williams v. Dixon,* 961 F.2d 448, 451 (4th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992), and perhaps could have prepared more thoroughly for the resentencing proceeding, Turner has not shown that Snook's performance fell below an objective standard of reasonableness. In fact, Snook's opening statement to the jury, which described Turner's background, belies that contention. Even Turner's expert witness (Dr. Link) at the state habeas hearing conceded that Snook's opening statement demonstrated familiarity with Turner's background.

b. The 1984 Mecklenburg breakout

■ More readily disposable is Turner's claim that "[n]o investigation was undertaken of the 1984 breakout incident at Mecklenburg or of the constructive role [he] played in protecting the lives of hostages and other inmates when the situation was most tense." Appellant's Br. at 9. As noted above, Snook was well aware of the facts surrounding, and Turner's role in, the Mecklenburg incident. In fact, in 1985 Snook wrote a letter to then-Governor Robb requesting clemency, wherein he described the gratuitous actions taken by Turner during the escape. Because Snook previously had conducted an investigation of the incident, it was not unreasonable for him to find it unnecessary "to go back and track these people down again. . . ." JA 1246.

2. *Supervision and Preparation of Mental Health Expert*

In his next attack on Snook's pretrial performance, Turner contends that Snook inadequately supervised and prepared Dr. Fisher, a court-appointed mental health expert. He emphasizes that, because of Snook's alleged inattentiveness, Dr. Fisher failed to examine him (Turner) prior to the resentencing proceeding. (Dr. Fisher examined Turner after the resentencing proceeding was underway.) Consequently, he says, Dr. Fisher was forced to base his diagnosis on trial transcripts and prison and medical records.

■ To evaluate the reasonableness of Snook's handling of Dr. Fisher, we must back up and recognize why Dr. Fisher was retained. The jury in *Turner I* had recommended the death penalty after finding that both aggravating factors, future dangerousness and vileness, were established. Snook and Woodward, however, did not think that the murder of Smith fit within the vileness factor. They thought that, although the resentencing jury might add vileness as a second factor if it first found future dangerousness, it likely would not find vileness in the absence of future dangerousness. Thus, their strategy was to convince the jury that Turner no longer represented a future danger to society. It was for this reason that Snook sought the appointment of Dr. Fisher.

Dr. Fisher, a clinical forensic psychologist, was an expert in the field of prison conditions, the classification of prisoners, and the

adaptability of inmates to prison life. Snook sought a rather narrow opinion from Dr. Fisher—that Turner's violent days were behind him and that he no longer posed a future danger to others. Dr. Fisher referred to this as the "burnout syndrome," whereby one diagnosed as having had an antisocial personality disorder in his early years begins to manifest less antisocial behavior by his mid-thirties (Turner was in his forties).

Significantly, because Snook concluded that Turner's mental health was not a viable issue, Snook never intended to have Dr. Fisher provide a conventional psychological diagnosis or question the validity of any prior psychological diagnoses. Snook wanted him because he was a corrections expert; it was irrelevant to Snook that Dr. Fisher was a psychologist. It thus was not remarkable that "Dr. Fisher did not know any of the details of [Turner's] crime, much less anything about his psychiatric condition." Appellant's Br. at 25. As for the necessity of a personal examination, Dr. Fisher explained in his affidavit for the state habeas hearing that, because future dangerousness was the focus of the resentencing proceeding, "the existing prisoner and medical files for Mr. Turner, which were ample, became that much more important in my evaluation. Once I carefully reviewed these various materials, one direct meeting with Mr. Turner was all that became necessary." JA 1913.

We conclude that Snook's handling of Dr. Fisher did not fall below an objective standard of reasonableness. In addition, we fail to see how Turner could have been prejudiced by Dr. Fisher's failure to examine him prior to trial. When he examined Turner after the resentencing proceeding was underway, Dr. Fisher discovered nothing new and only confirmed his previously developed conclusions.

### 3. Failure to Interview Prosecution Witnesses

■ Turner complains that Snook did not interview the Commonwealth's witnesses. "'A claim of failure to interview a witness may sound impressive in the abstract, but it cannot establish ineffective assistance when the person's account is otherwise fairly

known to defense counsel.'" Eggleston v. United States, 798 F.2d 374, 376 (9th Cir. 1986) (quoting United States v. Decoster, 624 F.2d 196, 209 (D.C.Cir.1976) (en banc)); see Mulligan v. Kemp, 771 F.2d 1436, 1442 (11th Cir.1985), cert. denied, 480 U.S. 911, 107 S.Ct. 1358, 94 L.Ed.2d 529 (1987). Here, from their conversations with the prosecutor, Snook and Woodward were aware of the substance of the witnesses' anticipated testimony. Turner has not identified additional information that would have been revealed had counsel interviewed the Commonwealth's witnesses. See Eggleston, 798 F.2d at 376; Aldrich v. Wainwright, 777 F.2d 630, 636–37 (11th Cir.1985), cert. denied, 479 U.S. 918, 107 S.Ct. 324, 93 L.Ed.2d 297 (1986).

### B. Trial Performance

In addition to the above attacks on Snook's pretrial preparation, Turner next challenges Snook's trial performance in three respects: (1) he informed prospective jurors that a jury previously had sentenced Turner to death for the murder of Smith, (2) he failed to present any mitigating evidence, and (3) he failed to put on the mitigating evidence described in the opening statement to the jury.

#### 1. Informing Prospective Jurors of the Prior Sentence

■ Because the resentencing jury would be told that its sole function was to determine the penalty for a murder committed nine years earlier and that it could only choose between life imprisonment and death, Snook and Woodward were concerned that jurors would deduce that Turner previously had been sentenced to death for the murder of Smith; i.e., the jurors would figure out that one sentenced to life would not appeal and risk a death sentence.

More importantly, the Commonwealth planned to introduce evidence of Turner's involvement in the highly publicized 1984 escape, and in a 1985 attempted escape, from death row at Mecklenburg. Snook reasoned that, from references to Mecklenburg, death row or the names of the prisoners who escaped, jurors surely would realize that Turner was sentenced to death for the murder of Smith.

Snook and Woodward thus faced a dilemma. They thought their best alternative was to ask the court to preclude the Commonwealth from mentioning Mecklenburg, death row or the prisoners who escaped; for example, "a fictionalized prison in some fictionalized location with fictionalized co-conspirators." JA 828. Indeed, this was the advice of the death penalty experts with whom Snook consulted. Accordingly, in a pretrial hearing, counsel urged the court to preclude the Commonwealth from making direct or indirect references to Turner's having been on death row:

> MR. WOODWARD: Let me ask a question now.... If the defendant elects not to have [the prior sentence] brought to the attention of the jury, then would the Commonwealth be precluded, not that he attempted to escape from Mecklenburg, but would he be precluded from indicating that he attempted to escape from death row?
>
> THE COURT: No, sir. No.
>
> . . . . .
>
> THE COURT: You can't cover it up, Tom.
>
> . . . . .
>
> MR. WOODWARD: ... but I'm simply asking ... is not there a way to present it so that death row doesn't come out?
>
> . . . . .
>
> MR. WOODWARD: ... I'm simply asking more as a matter of inquiry is not there a way ... without indicating that people are on death row. Can't you go through institutional escape without going through what people are there for?
>
> THE COURT: No, because I don't think you can do it. The Commonwealth is going to try to show the future dangerousness of the individual. You're going to try to show that even though this man has been convicted of capital murder and is being held in Mecklenburg and this, that, and the other. I don't know, it seems to me it makes your case stronger to tell them it was than if you try to hold it away from them.
>
> MR. WOODWARD: Again, I'm simply asking.
>
> THE COURT: There's no way I can see to keep it from them. If he's on death row these guards are going to come in and testify and these other people are going to come in and testify....

JA 152–54. The court's position was clear. Snook decided to inform prospective jurors about the prior death sentence.

Turner says this decision amounted to ineffective assistance under *Strickland*. He cites two cases to support his claim, *Arthur v. Bordenkircher*, 715 F.2d 118 (4th Cir. 1983), and *Barker v. Commonwealth*, 230 Va. 370, 337 S.E.2d 729 (1985). In *Arthur*, a pre-*Strickland* case, we found ineffective assistance where counsel drafted and consented to the reading of a jury instruction stating that defendant had been convicted by another jury for the same murder, but was being retried because his earlier conviction had been reversed on procedural grounds. *Arthur*, 715 F.2d at 118–19. In *Barker*, which was not an ineffective assistance case, a prospective juror in a retrial stated during *voir dire* that she was aware defendant had been convicted previously of the crime charged and that she was aware of his prior sentence. *Barker*, 337 S.E.2d at 732. The issue before the Supreme Court of Virginia was whether the trial court erred in refusing to exclude her for cause. *Id.* The court held "that when a venireman knows of an accused's previous conviction of the same offense for which he is being retried, the venireman cannot qualify as a juror in the new trial." *Id.* at 733.

*Barker* and *Arthur* stand for the general proposition that a defendant's case is damaged by a juror's knowledge that defendant had previously been convicted for the crime charged. We cannot disagree with that proposition in the abstract, and the reasoning of those cases should apply when a juror in a capital sentencing proceeding learns that a prior jury had imposed the death penalty for the crime charged. *Cf. Burger*, 483 U.S. at 788, 107 S.Ct. at 3122–23 (comparing capital sentencing proceeding to a trial). However, we do not read these cases to mandate a finding of ineffective assistance as a matter of law. *See Strickland*, 466 U.S. at 688–89, 104 S.Ct. at 2065 (noting that no "set of detailed rules for counsel's conduct can satis-

factorily take account of the variety of circumstances faced by defense counsel"). These decisions simply do not address whether it is unreasonable in all circumstances for counsel to inform a prospective juror about a prior verdict. In neither case, for instance, was there any indication that it would be difficult to impanel a jury with no knowledge of the prior verdict. In this case, however, Snook (well aware of the *Barker* decision) reasonably thought it more likely than not that jurors would learn of the prior death sentence.

The question, then, is whether Snook acted unreasonably in the face of his dilemma. He requested that the court declare inadmissible any references by the Commonwealth to death row or the prisoners who escaped from Mecklenburg. The court denied this request. He also considered using *voir dire* to strike for cause those prospective jurors with knowledge of the 1984 Mecklenburg escape, but decided that this would not be practical. This conclusion was justifiable because, although he might have been able to impanel a jury that was unaware of the 1984 escape, the Commonwealth nevertheless could have mentioned death row. Having exhausted these alternatives, Snook decided to inform the venire of the prior death sentence so he could appear forthcoming and, more impor-

tantly, so he could gauge the reaction of each prospective juror during *voir dire*. He then could strike for cause any prospective jurors who indicated that they would be more inclined to impose the death penalty because of their knowledge of the prior sentence. *Contra Arthur*, 715 F.2d at 119 (jurors, as opposed to *prospective* jurors, were informed of the prior conviction).[23]

In the final analysis, *Strickland* teaches that "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064–65. Considering all the circumstances in this case—namely, the anticipated direct or indirect references to death row in conjunction with the risk that jurors might independently deduce the prior death sentence—we hold that counsel did not fall below an objective standard of reasonableness. Rather, this was the type of strategic decision to which we must defer under *Strickland*.[24]

### 2. Failure to Present Mitigating Evidence

The Commonwealth finished its case in chief on Friday, January 9, 1987. On Monday, January 12, defense counsel rested without putting on any mitigating evidence. Turner claims this decision was both unreason-

---

**23.** To that end, Turner says that one prospective juror, Samuel Lambert, indicated during *voir dire* that his knowledge of the prior death sentence would affect his judgment. Perhaps Lambert equivocated at first, but after Snook moved to strike him for cause, the resentencing court pursued the matter further. The court asked whether Lambert could base his decision solely on what he heard at the resentencing proceeding and not on the prior death sentence. Lambert answered in the affirmative. The court, having observed Lambert, was satisfied with his response. We agree with the district court below that there is nothing in the record that could have us doubt the resentencing court's finding of impartiality. *See Turner*, 812 F.Supp. at 1435; *see also Turner*, 364 S.E.2d at 486 (Supreme Court of Virginia, on direct review in *Turner II*, finding no abuse of discretion).

**24.** Turner says that counsel were unreasonable for ignoring the advice of experts from the NAACP Legal Defense Fund and the Southern Prisoners Defense Committee. Those experts were of the opinion that a jury never should be informed that a defendant had previously been

sentenced to death for the same crime. Though perhaps a prudent rule in theory, such a categorical rule was of no help here in light of the difficulties counsel would face in attempting to keep this evidence from the jury. In fact, counsel followed the only practical suggestion offered by these experts when they moved for redaction of damaging references from the Commonwealth's evidence, but the trial court was not amenable to this approach.

Because Turner accords weight to the views of death penalty "experts," it is perhaps worth noting here that Snook, who lectured and wrote about death penalty defense, was no novice himself. The state habeas court found that Snook was "one of the experts in the field of capital cases," had "handled more death penalty litigation than any other private attorney in Virginia," and was "one of the most experienced criminal lawyers in Virginia." JA 1486. Furthermore, the court found that Woodward "was undoubtedly one of the most effective criminal lawyers in Eastern Virginia." *Id.* He had been practicing criminal law for nearly two decades, "predominantly representing criminal defendants from the same or similar backgrounds as Turner." *Id.*

able and prejudicial under *Strickland*. As set out below, we conclude that counsel made a sound tactical decision not to present any mitigating evidence, a decision which we should avoid second guessing.

The Commonwealth had in its possession a substantial amount of aggravating evidence. Yet, the prosecutor, Grizzard, put on a rather mild case in chief. He first presented the facts of the Smith murder. But instead of putting on live eyewitness testimony, transcripts from the *Turner I* sentencing proceeding were read verbatim to the jury. Snook thought the jury appeared bored by this approach.

Next, Grizzard presented Turner's criminal history. But, instead of fleshing out the aggravating details of his numerous prior crimes, an official from the Virginia Department of Corrections simply stated each offense, and the date, location and sentence for each offense.

Finally, Grizzard presented evidence relating to the 1984 breakout and the 1985 attempted escape from Mecklenburg. With regard to the 1984 escape, instead of calling eyewitnesses to testify about Turner's role and actions, the Commonwealth called a police officer (Officer Mills) to read Turner's account of the incident. (Mills had interviewed Turner in the presence of Snook shortly after the incident.)

In short, despite the fact that the Commonwealth had a substantial amount of damaging evidence relating to future dangerousness, by its own account it withheld from its case in chief eighty percent of that evidence, including some of the most damaging information. For example, Grizzard was prepared to call Lorenzo Artis, the victim of Turner's 1970 malicious wounding offense, and police officers involved with that incident. Artis would have described how Turner shot him five times as he (Artis) left a restaurant; a police officer (Chief Britt) would have presented Turner's reaction when arrested: "[Y]ou-all after me because I shot that nigger? ... I hope he dies." JA 695.

■ Snook and Woodward were well aware of the Commonwealth's evidence, and they knew that Grizzard's strategy was to dump damaging evidence during cross-examination and rebuttal. (In fact, Grizzard effectively used the same strategy in *Turner I*, where the jury found future dangerousness in addition to vileness.) Nevertheless, Snook and Woodward were surprised at how much Grizzard withheld from his case in chief; they thought he made a tactical error, and they thought Turner could not be in a much better position at that point. Because Snook believed "there was more evidence suggestive of [Turner's] bad character than there was suggestive of his good character," JA 797, and that it might do more harm than good to open the door for more aggravating evidence, they immediately considered not putting on any mitigating evidence.

Snook first decided not to call Dr. Fisher. Dr. Fisher's function, after all, was to rebut the Commonwealth's future dangerousness evidence, much of which had not been presented in its case in chief. And, the Commonwealth's principal strategy was to wait for Dr. Fisher's testimony to open the door for significant aggravating evidence during cross-examination and rebuttal. For instance, Grizzard would have called Dr. Lee, a clinical psychologist, to testify "that there was a substantial probability that Mr. Turner would commit future criminal offenses of a violent nature. And of the degree that this would probably put society in danger." JA 1133. A psychiatrist (Dr. Dimitris) would have confirmed this. Thus, calling Dr. Fisher could have done more harm than good, and Snook's decision not to call Dr. Fisher clearly was the type of tactical decision to which we must defer under *Strickland. See Fitzgerald v. Thompson*, 943 F.2d 463, 470 (4th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1219, 117 L.Ed.2d 456 (1992); *Bunch*, 949 F.2d at 1364 (had counsel called their psychiatrist, harmful evidence would have emerged on cross-examination). Indeed, Turner's expert (Dr. Link) at the state habeas hearing conceded it "was a good decision not to use [Dr. Fisher]." JA 1096.

Likewise, although a closer call, it was a tactical decision not to present evidence relating to Turner's gratuitous actions during the 1984 Mecklenburg escape. Here, there

was more concern with cross-examination than rebuttal. For example, although witnesses could have testified that Turner helped some of the hostages, they also would have reaffirmed the aggravating circumstances surrounding Turner's role in the incident. Indeed, one of Turner's potential witnesses (Officer Fitts) could have revealed on cross-examination that Turner stuck a knife in his back and told him to "get down or die." JA 2337, 2335.

The best mitigating evidence here was a statement allegedly made by Turner to other inmates who were threatening to kill some hostages: "You're going to have to go thru [sic] me first. If you're going to kill somebody, you will have to kill me first." JA 2364. Yet, by withholding this statement, Snook precluded the Commonwealth from recycling (on cross-examination) aggravating evidence about Turner's role in the escape: Turner helped plan and execute the escape of dangerous death row inmates, he provided inmates with weapons, he took hostages, etc. Although the jury had already heard this aggravating evidence, it had heard it only once—and only from Turner's perspective (from Officer Mills' interview after the incident). We cannot fault counsel for wanting to leave it at that. Moreover, Snook thought the Commonwealth's reliance on Turner's statement made him appear trustworthy. (We note that Turner's account of the incident, which was read to the jury, did include some mitigating facts: He wanted to back out of the plan, he urged the inmates not to harm a correctional officer, he tried to give a knife to Lt. Hawkins, and he checked on Nurse Barksdale, who had been disrobed and placed in his cell.)

Having decided not to call Dr. Fisher or Mecklenburg witnesses, Snook was left with background and character evidence, which he thought to be rather marginal. As for the background evidence in particular, Snook thought that juries were not very receptive to evidence of a deprived upbringing without a "solid mental health issue." JA 836–37. And, Snook and Woodward thought it might offend some members of the rural Virginia jury if they emphasized Turner's deprived upbringing or suggested that one might commit murder as a result of it. *See Card v.*

*Dugger,* 911 F.2d 1494, 1511 (11th Cir.1990) ("emphasizing a client's deprived childhood does not have a very beneficial impact on a northwest Florida jury, given the fact that many jurors have had difficult lives, but have not turned to criminal conduct"). Indeed, during his opening statement Snook had noticed that some jurors appeared unreceptive when he referred to Turner's deprived upbringing.

Of more concern was the permissible scope of rebuttal were Snook to put on background or character evidence. Snook did not believe this evidence was so overwhelming that it was worth opening the door for extensive aggravating evidence. Accordingly, Snook and Woodward returned to court on Monday, January 12, 1987, and asked for a ruling on the permissible scope of rebuttal evidence. The court declined to rule on the motion until it heard the specific evidence at trial but clearly indicated that there would be few, if any, restrictions on the scope of rebuttal. *See, e.g.,* JA 424–25 (the court warned, "I think the Commonwealth has a right to come back and show the bad, if you show the good"); JA 426 (the court advised, "[b]ecause this whole hearing is based on ... what kind of man is Willie Lloyd Turner ... you've got to take the bitter with the sweet and vice versa"); *id.* (court saying the Commonwealth can "come in and show well, [Turner] was a pretty bad guy"). Snook and Woodward immediately told the court that, based on the court's statements, they would rest their case without putting on any evidence.

In sum, Snook and Woodward thought Turner had a chance for a life sentence if the Commonwealth failed to meet its burden of establishing that Turner was a future danger to society. Snook thought (and argued to the jury during closing argument) that the Commonwealth did not carry that burden in its case in chief. Moreover, he was concerned that the presentation of mitigating evidence would provoke damaging cross-examination and rebuttal. As we have observed:

> Trial counsel is too frequently placed in a no-win situation with respect to possible mitigating evidence at the sentencing phase of a capital case. The failure to put on such evidence, or the presentation of evidence which then backfires, may equally expose counsel to collateral charges of in-

effectiveness. The best course for a federal habeas court is to credit plausible strategic judgments in the trial of a state case. *Bunch,* 949 F.2d at 1364 (failure to put on evidence of traumatic childhood and psychiatric testimony). In view of all the circumstances surrounding Snook's decision to forego a mitigation case, Turner has not overcome the presumption that the decision constituted "sound trial strategy," *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. *See Burger,* 483 U.S. at 795, 107 S.Ct. at 3126; *Strickland,* 466 U.S. at 700, 104 S.Ct. at 2071; *Bunch,* 949 F.2d at 1364; *Whitley v. Bair,* 802 F.2d 1487, 1496 (4th Cir.1986), *cert. denied,* 480 U.S. 951, 107 S.Ct. 1618, 94 L.Ed.2d 802 (1987); *McAleese v. Mazurkiewicz,* 1 F.3d 159, 167 (3d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 645, 126 L.Ed.2d 603 (1993); *Prejean v. Smith,* 889 F.2d 1391, 1398 (5th Cir.1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1836, 108 L.Ed.2d 964 (1990); *Mitchell v. Kemp,* 762 F.2d 886, 890 (11th Cir.1985), *cert. denied,* 483 U.S. 1026, 107 S.Ct. 3248, 97 L.Ed.2d 774 (1987). Having held that counsel did not fall below an objective standard of reasonableness, we need not explore whether Turner was prejudiced by the failure to introduce mitigating evidence.[25]

3. *Failure to Put On Mitigating Evidence Described in the Opening Statement*

At the outset of the sentencing proceeding, Snook planned to introduce mitigating evidence. Accordingly, in his opening statement, he told the jury that he would produce certain mitigating evidence (testimony and other evidence). As discussed above, he rested without putting on that evidence. Turner says Snook's failure to present the evidence described in the opening statement, in and of itself, was ineffective assistance. We disagree.

Turner relies principally on a First Circuit decision, *Anderson v. Butler,* 858 F.2d 16 (1st Cir.1988). In *Anderson,* defense counsel, in his opening at the close of the state's case, told the jury that he would call a psychiatrist and a psychologist. *Id.* at 17. The next day counsel rested without calling the doctors. *Id.* The court, over then-Judge Breyer's dissent, emphasized that "little is more damaging than to fail to produce important evidence that had been promised in an opening" because "the jurors would believe, in the absence of some other explanation, ... that the [witnesses] were unwilling, viz., unable, to live up to their billing." *Id.* The court's opinion suggests that counsel renders ineffective assistance as a matter of law when evidence promised in an opening statement is not delivered at trial, unless perhaps counsel completely abandons a defense. *See id.* at 18–19. Turner asks that we adopt such a rule.[26]

However, in a recent case not cited by Turner, *United States v. McGill,* 11 F.3d 223

**25.** The district court below apparently concluded that Turner was not prejudiced by Snook's failure to present the Mecklenburg evidence, because this evidence was relevant only to the issue of future dangerousness (which the jury did not find), not vileness. *See Turner,* 812 F.Supp. at 1429–30. The suggestion here is that a petitioner cannot be prejudiced when counsel withholds mitigating evidence that lacks a direct substantive relationship to the aggravating factor(s) found by the sentencer. The Supreme Court, however, has made clear that a sentencer may not be precluded from considering, and therefore basing a life sentence on, any mitigating evidence—even when there is no direct relationship between that evidence and the established aggravating factor(s). *See Hitchcock v. Dugger,* 481 U.S. 393, 398–99, 107 S.Ct. 1821, 1824–25, 95 L.Ed.2d 347 (1987); *Skipper v. South Carolina,* 476 U.S. 1, 4–5, 106 S.Ct. 1669, 1670–71, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104, 114–16, 102 S.Ct. 869, 877–78, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978) (plurality opinion). It follows that a petitioner may be prejudiced when counsel fails to present "unrelated" mitigating evidence, so long as there is a reasonable probability that, had the sentencer considered the mitigating evidence, it "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069.

**26.** Turner also refers us to a Seventh Circuit decision, *Harris v. Reed,* 894 F.2d 871 (7th Cir. 1990), which cited *Anderson.* But *Harris* did not involve a distinct challenge to counsel's failure to put on evidence promised in an opening statement. Rather, defendant attacked generally counsel's failure to put on mitigating evidence, evidence the court thought "would have greatly aided his case." *See id.* at 879. The fact that

(1st Cir.1993), the First Circuit appeared to read narrowly its *Anderson* decision. The court said: "Although a failure to produce a promised witness *may under some circumstances* be deemed ineffective assistance, *see, e.g., Anderson v. Butler,* 858 F.2d 16, 19 (1st Cir.1988), the determination of inefficacy is *necessarily fact based.* '[N]o particular set of rules can be established to define effective assistance....'" *Id.* at 227 (emphases added) (quoting *United States v. Natanel,* 938 F.2d 302, 310 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992)).

■ We agree with the reasoning of the more recent First Circuit decision and with Judge Breyer's dissenting opinion in *Anderson,* both of which adhere to *Strickland*'s express warning that:

No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

*Strickland,* 466 U.S. at 688–89, 104 S.Ct. at 2065. *See also McAleese,* 1 F.3d at 167–68 (in *dicta,* the Third Circuit noted that even if the opening statement contained an implicit promise to produce certain evidence, counsel's "later decision not to do so is not necessarily ineffective"); *Johnson v. Johnson,* 531 F.2d 169, 177 n. 19 (3d Cir.), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). In our view, assuming counsel does not know at the time of the opening statement that he will not produce the promised evidence, an informed change of strategy in the midst of trial is "virtually unchallengeable," *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Were we to adopt Turner's position, we would effectively be instructing defense counsel to continue to pursue a trial strategy even after they conclude that the original strategy was mistaken or that the client may

be better served by a different strategy. *See Anderson,* 858 F.2d at 20 (Breyer, J., dissenting) ("Consider the pressure that such a view places upon a criminal defense attorney (once having mentioned a witness) to call that witness, *even if doing so will hurt his client.*"). In addition, we would discourage counsel from making effective use of opening statements, thereby precipitating ineffective assistance challenges to the quality of opening statements.

■ In the instant case, Snook intended at the outset to present the evidence described in the opening statement. He changed his trial strategy because he thought the Commonwealth rested prematurely and because the court indicated that the scope of rebuttal would be quite broad. We conclude that his strategic decision to withhold evidence promised in the opening statement was not unreasonable. Nor was it unreasonable for him to mention mitigating evidence in his opening statement. This, again, was a strategic decision; had Snook not described mitigating evidence in the opening statement, we suspect that Turner would have challenged that omission. Finally, Turner's allegation that the opening statement was made without the benefit of adequate pretrial preparation must be rejected, for we have concluded above that Snook's pretrial preparation was adequate.

## VI

In conclusion, we hold that the Virginia courts applied the statutory vileness factor in a constitutionally adequate manner and that counsel did not render ineffective assistance. We therefore affirm the district court's denial of Turner's § 2254 petition for habeas corpus.

*AFFIRMED.*

LUTTIG, Circuit Judge, concurring in the judgment:

Treating the express language of United States Supreme Court opinions as mere exhortation, rather than as binding interpre-

---

this evidence was described in the opening statement, though a factor, was not determinative.

*See id.*

tation of law, the majority fundamentally alters for this circuit the Supreme Court's "new rule" jurisprudence governing federal *habeas* review. In its stead, the majority substitutes a doctrine that requires federal courts to review on the merits every claim "predicated on" a prior precedent, whether or not the relief sought by the petitioner is dictated by that precedent. As its own opinion reveals, the majority thereby requires full merits review even of claims that are wholly without merit under precedent existing at the time a petitioner's conviction became final. The majority thus eviscerates the Supreme Court's decisions in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and succeeding cases, and requires the kind of endless, intrusive review of state court judgments by federal *habeas* courts that it was the express purpose of *Teague* to arrest.

In adopting its new standard, the majority all but ignores the Supreme Court's recent decision in *Graham v. Collins,* —— U.S. ——, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993), which stands as directly contrary authority to the majority's new pronouncement, consigning *Graham* to a line of Supreme Court cases that, it informs us, has only "added more words," but no guidance, to the "new rule" inquiry. *Ante* at 879. If this were not enough, the majority mischaracterizes at least four other Supreme Court cases, *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), *Stringer v. Black,* —— U.S. ——, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992), *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), and *Shell v. Mississippi,* 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990), and overlooks a fifth, *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), that stand between it and the new standard it announces. Because of the majority's startling disregard for Supreme Court authority, and because of the enormous consequences for *habeas* review wrought by this disregard, I do not join the court's opinion.

I.

A.

The Supreme Court has stated repeatedly that the rule sought by a *habeas* petitioner is "new," and thus consideration of the underlying claim barred, unless reasonable jurists considering the petitioner's claim at the time his conviction became final " 'would have felt *compelled by existing precedent' to rule in his favor."* *Graham,* —— U.S. at ——, 113 S.Ct. at 898 (emphasis added) (quoting *Saffle v. Parks,* 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990)). With similar frequency and clarity, the Court has declared, as a corollary, that it is *in* sufficient that prior decisions "inform, or even control or govern, the analysis of" a petitioner's claim. *Parks,* 494 U.S. at 491, 110 S.Ct. at 1262. *See also Sawyer v. Smith,* 497 U.S. 227, 236, 110 S.Ct. 2822, 2828, 111 L.Ed.2d 193 (1990) (quoting *Parks* with approval); *Butler v. McKellar,* 494 U.S. 407, 415, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990) (decision within the "logical compass" of an earlier decision may nonetheless announce new rule).

Without even a discussion of this established standard, and through the artifice of substituting terms of different meaning for the terms of the Supreme Court standard, the majority adopts for this circuit a standard that compels federal *habeas* review if a petitioner's claim is "predicated on" prior decisions, or if prior decisions "dictate" the petitioner's "challenge." *Ante* at 883 (rejecting Commonwealth's *Teague* argument because it "focuses on the most specific conclusion or holding Turner hopes we reach: that the limiting definition used in his case was constitutionally insufficient"). Thus, holding that Turner does not seek a new rule within the meaning of *Teague* because "Turner's challenge is predicated on *Godfrey* [*v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) ]," *ante* at 882, and "*Godfrey* ... dictates Turner's challenge," *id.* at 881,[1] the majority undertakes full merits review of a

---

1. *See also ante* at 882 ("Because *Stringer* expressly held that *Godfrey* dictated Cartwright's claim and thus Cartwright did not seek a new rule for purposes of *Teague,* we are compelled to reach

the same conclusion here."); *id.* at 882 ("The Tenth Circuit's decision [in *Cartwright*] was predicated on *Godfrey.");* *id.* at 882–83 n. 9 ("Several [later] Supreme Court decisions ... seemingly

claim as to which it concedes Turner is unquestionably not entitled to relief.

Rejecting the majority's standard, the Supreme Court has stated time and again that prior precedent must dictate the relief sought by the *habeas* petitioner in order to avoid *Teague*'s bar to federal review. *See, e.g., Penry,* 492 U.S. at 313, 109 S.Ct. at 2944 ("[W]e must determine, as a threshold matter, *whether granting [Penry] the relief he seeks* would create a 'new rule.'" (emphasis added) (quoting *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070)); *Graham,* — U.S. at —, 113 S.Ct. at 900 ("We cannot say that reasonable jurists considering petitioner's claim in 1984 would have felt that these cases '*dictated*' *vacatur of petitioner's death sentence.*" (emphasis added) (quoting *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070)); *Graham,* — U.S. at —, 113 S.Ct. at 902 ("This distinction leads us to conclude that neither *Penry* nor any of its predecessors '*dictates*' *the relief Graham seeks* within the meaning required by *Teague.*" (emphasis added)); *id.* — U.S. at —, 113 S.Ct. at 903 ("We cannot say that all reasonable jurists would have deemed themselves *compelled to accept Graham's claim* in 1984." (emphasis added)); *Stringer,* — U.S. at —, 112 S.Ct. at 1135 (*Teague* inquiry asks "*whether granting the relief sought [by the petitioner]* would create a new rule because the prior decision is applied in a novel setting, thereby extending the precedent." (emphasis added)); *id.* ("[A] case decided after a petitioner's conviction

and sentence became final may not be the predicate *for federal habeas corpus relief* unless the decision was dictated by precedent ...." (emphasis added)); *Johnson v. Texas,* — U.S. —, —, 113 S.Ct. 2658, 2668, 125 L.Ed.2d 290 (1993) ("In rejecting the contention that *Penry* dictated *a ruling in the defendant's favor* [in *Graham*], we stated that ...." (emphasis added)); *id.* ("We also did not accept the view that the *Lockett*[ *v. State of Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)] and *Eddings*[ *v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)] line of cases, upon which *Penry* rested, *compelled a holding for the defendant* in *Graham* ...." (emphasis added)); *id.* ("We concluded that, even with the benefit of the subsequent *Penry* decision, reasonable jurists at the time of Graham's sentencing 'would [not] have deemed themselves *compelled to accept Graham's claim.*'" (emphasis added) (quoting *Graham,* — U.S. at —, 113 S.Ct. at 903)); *Johnson,* — U.S. at —, 113 S.Ct. at 2668 ("Thus, we held that *a ruling in favor of Graham* would have required the impermissible application of a new rule under *Teague.*" (emphasis added)); *id.* at —, 113 S.Ct. at 2671 ("To rule in petitioner's favor...."); *Caspari v. Bohlen,* — U.S. —, —, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994) ("The nonretroactivity principle *prevents a federal court from granting habeas corpus relief* to a state prisoner based on a rule announced after his conviction and sentence became final." (emphasis added)).[2]

Indeed, even the dissenting Justices in the continuing debate over the contours of the "new rule" doctrine fully accept that the

take for granted that challenges to a state's limiting construction are predicated on *Godfrey* and *Cartwright.*").

**2.** The holding in *Bohlen,* which is the Court's most recent *Teague* decision, is fully consistent with the other cases in the *Teague* line of authority. The majority states that in *Bohlen,* "the Court focused on the more general rule sought— that the Double Jeopardy Clause applies to a noncapital sentencing proceeding—as opposed to the specific holding sought by the petitioner, that his sentence violated the Double Jeopardy

Clause." *Ante* at 883. This distinction is a false one. Granting Bohlen's proposed relief—declaring his sentence unconstitutional—would have required a holding that the Double Jeopardy Clause applied with the same force in noncapital, as in capital, sentencing. The Court held that reasonable jurists at the time Bohlen's conviction became final would not have believed such a holding was dictated by precedent. Hence, they would not have been compelled to rule in Bohlen's favor and declare his sentence unconstitutional. *See Bohlen,* — U.S. at —–—, 114 S.Ct. at 955–56.

extant precedent must dictate a ruling in the petitioner's favor. Justice Souter, for example, who authored the dissent in *Graham*, could not have been clearer as to this requirement of the "new rule" doctrine when he wrote in *Wright v. West*, —— U.S. ——, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992), that "[t]o survive *Teague*, [a rule] must be 'old' enough to have predated the finality of the prisoner's conviction, *and specific enough to dictate the rule on which the conviction may be held to be unlawful.*" *Id.* at ——, 112 S.Ct. at 2501 (Souter, J., concurring) (emphasis added); *see also id.* at ——, 112 S.Ct. at 2502 (Souter, J., concurring) ("[I]n light of authority extant when his conviction became final, *its unlawfulness must be apparent.*" (emphasis added)). Justice Brennan also acknowledged that this is the standard governing federal *habeas* review. As he stated in *Butler*, the Court in *Teague* "declared that a federal court entertaining a state prisoner's habeas petition generally may not reach the merits of the legal claim unless the court determines, as a threshold matter, that a *favorable ruling on the claim* would flow from the application of [pre-existing] legal standards." *Butler*, 494 U.S. at 417, 110 S.Ct. at 1218–19 (Brennan, J., dissenting) (emphasis added); *see also id.* at 417–18, 110 S.Ct. at 1219 (Brennan, J., dissenting) ("Put another way, a state prisoner can secure habeas relief only by showing that the state court's rejection of the constitutional challenge *was so clearly invalid* under then-prevailing legal standards that the decision could not be defended by any reasonable jurist." (emphasis added)); *West*, —— U.S. at ——, 112 S.Ct. at 2490 ("[A] federal habeas court 'must defer to the state court's decision rejecting the claim *unless that decision is patently unreasonable.*'" (emphasis added) (quoting *Butler*, 494 U.S. at 422, 110 S.Ct. at 1221 (Brennan, J., dissenting))).

The majority appears to believe that those Justices who have either dissented from or concurred separately in the Supreme Court's *Teague* cases disagree with the Court's majority that prior precedent must dictate the relief sought by the petitioner. This misunderstanding seems to stem from the majority's failure to appreciate the nuance of the position taken by the dissent in *Graham*. *See* discussion *infra* at 909–11. In *Graham*, the dissent does state that "application of an existing precedent in a new factual setting will not amount to announcing a new rule." *Graham*, —— U.S. at ——, 113 S.Ct. at 918 (Souter, J., dissenting). However, the dissent's view that Graham sought only the application of *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), was not based on the conclusion that resolution of the case, *whether for or against Graham*, would be by resort to the rule in *Jurek*, but rather on the twin conclusions that Graham's evidence was not materially different from Penry's, *see Graham*, —— U.S. at ——, 113 S.Ct. at 920 (Souter, J., dissenting), and that both types of evidence received essentially the same degree of consideration in mitigation, *see id.* ("Graham's claim that his evidence could receive only partial consideration is just as much a claim for application of the pre-existing rule demanding the opportunity for full effect as was Penry's claim that his retardation could be given no effect under the second Texas special issue."). It was for these reasons that the dissenters concluded *Graham* was indistinguishable from *Penry*. And "from [their] conclusion that the rule from which the petitioner sought to benefit in *Penry* was not 'new,'" because *Jurek*, *Lockett*, and *Eddings* dictated the relief Penry sought, "it necessarily follow[ed] that the rule petitioner Graham [sought] [was] not new either." *Id.* See also *West*, —— U.S. at ——, 112 S.Ct. at 2497 (O'Connor, J., concurring) ("If a proffered factual distinction between the case under consideration and pre-existing precedent does not change the force with which the precedent's underlying principle applies, the distinction is not meaningful, and any deviation from precedent is not reasonable."). The dissenters, in other words, disagreed with the majority only over the question of the generality with which a pre-existing rule should be described.

In no *Teague* opinion—majority, concurring, or dissenting—has any Justice intimated, much less stated, that he or she might

adopt the standard employed by the majority today.

The standard adopted and consistently applied by the Court does not, contrary to the majority's belief, conflate the *Teague* inquiry and the decision on the merits. *See ante* at 887–88 n. 16. It is only if one does not accept the Court's standard that prior precedent must dictate the relief sought (as the majority does not) that the *Teague* inquiry appears circular and thus to merge into a disposition on the merits. If one follows the standard announced by the Court, it could not be clearer that, while the *Teague* inquiry, like a disposition on the merits, requires a canvassing of the applicable legal authority and a consideration of the facts in light of that authority, it is an inquiry quite different from a disposition on the merits. Under *Teague*, the ultimate question is solely whether the state court judgment was reasonable under authority existing at the time the defendant's conviction became final (*viz*, whether precedent dictated the relief sought), not whether the judgment was in fact correct as a matter of law. Thus, for example, one would not have to decide on the merits whether a limiting construction was constitutionally sufficient in order to know whether the claim that the instruction was unconstitutional was *Teague*-barred. *Compare ante* at 887–89 n. 16. One would only have to decide whether precedent *dictated* such a holding. In short, the majority fails to appreciate that to determine what reasonable jurists would have believed precedent dictated is simply not to determine the merits of the claim.

### , B.

The requirement that prior precedent dictate a holding for the defendant was fashioned so as to "validate[ ] reasonable, good-faith interpretations of existing precedents made by state courts," *Butler*, 494 U.S. at 414, 110 S.Ct. at 1217, the Court having determined that the mere threat of reversal of convictions obtained in clear contradiction of established law would adequately protect federal rights. The requirement serves this purpose by ensuring that federal courts on *habeas* do not second-guess reasonable state court judgments, whether by reversal *or, as here, by affirmance wherein state court reasoning is critically examined and finely calibrated.* Not only will the standard adopted by the majority here not serve this and the other purposes underlying the "new rule" doctrine, it will affirmatively disserve these purposes in ways that would be hard to overstate.

Applying the majority's first locution of whether prior precedent "dictates the challenge," even against the petitioner, alone will result in an inestimable number of cases in which federal courts will undertake full merits review of reasonable, and in many instances unassailable, state court judgments. For in many cases that are not currently reviewable on federal *habeas*, the state court's judgment, as the one we review in this case, will have been dictated by existing precedent. Any cases not subject to review under the "dictates the challenge" locution will undoubtedly be subject to review under the majority's alternative formulation that the "new rule" doctrine does not bar consideration of any claim "predicated on" prior caselaw. This formulation will render reviewable on *habeas* essentially every claim, for almost every *habeas* petitioner necessarily "predicates" his claims on prior caselaw. *Cf. Penry*, 492 U.S. at 353, 109 S.Ct. at 2965 (Scalia, J., dissenting) ("In a system based on precedent and *stare decisis*, it is the tradition to find each decision 'inherent' in earlier cases....").

These consequences of the majority's decision underscore the magnitude of its error. The very purpose of *Teague* was to halt federal *habeas* review even of state court interpretations of federal law that ultimately prove *incorrect*, provided they are reasonable. Yet under the majority's reasoning, federal courts will be reviewing and deciding on the merits countless state court judgments that are not only reasonable but, as here, *indisputably correct*.

The standard adopted by the majority thus will completely frustrate the principles of finality, comity toward state judicial tribunals, *see Teague*, 489 U.S. at 310, 109 S.Ct. at 1075 ("[s]tate courts are understandably frustrated" when federal *habeas* courts re-

verse their reasonable rulings on federal law) (quoting *Engle v. Isaac,* 456 U.S. 107, 128 n. 33, 102 S.Ct. 1558, 1572 n. 33, 71 L.Ed.2d 783 (1982)), and respect for state prosecutorial authorities, *see Teague,* 489 U.S. at 310, 109 S.Ct. at 1075 (federal review should not require states "to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards"), that prompted adoption of *Teague*'s "new rule" doctrine in the first place.

## II.

If any of the Supreme Court's *Teague* cases had even hinted at the standard applied by the majority, its action would not be so disconcerting. However, in order to forge its new *Teague* standard, the majority must ignore the Supreme Court precedent that proves its error and misread or overlook at least five other Supreme Court precedents that foreclose or otherwise cast doubt on the standard it adopts.

## A.

Most disturbingly, the majority simply refuses to directly confront *Graham,* a case that confirms that the majority has misstated and misapplied the Court's "new rule" doctrine, and reveals that it has seriously misread *Penry,* upon which it extensively relies.

In *Graham,* the petitioner sought *vacatur* of his death sentence on the grounds that Texas' "special issues" procedure for imposing the death penalty precluded his jury from giving mitigating effect to his evidence of youth, deprived upbringing, and redeeming character traits, in contravention of the Supreme Court's decisions in *Jurek, Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Specifically, Graham contended that Texas' capital sentencing scheme, which required juries to impose the death penalty if they answered three "special issues" questions in the affirmative, did not permit the jury to

give mitigating effect to his evidence.[3] Graham's unsuccessful *Teague* argument before the Supreme Court sounded much like Turner's argument before us, in that Graham claimed that he was simply seeking an "application" of prior law:

> He asks only what was granted in *Penry;* that the promise of *Jurek* be redeemed, and that the Court reaffirm the authority—from *Woodson*[ *v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)] to *Lockett* and *Eddings*—on which *Penry* rests.

Reply Brief of Petitioner at II.A., *Graham v. Collins,* —— U.S. ——, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993). *Cf. ante* at 886 ("*Godfrey* upheld the statutory vileness factor on the basis of 'assurances' that the sentencer's discretion would be channelled by constitutionally sufficient standards. Turner 'argues that those assurances were not fulfilled....' ").

Consistent with its prior cases, the *Graham* Court stated the governing inquiry as whether reasonable jurists would have believed themselves compelled by the prior precedent to rule in petitioner's favor:

> Thus, unless reasonable jurists hearing petitioner's claim at the time his conviction became final *"would have felt compelled by existing precedent"* to rule in his favor, we are barred from doing so now.

*Graham,* —— U.S. at ——, 113 S.Ct. at 898 (emphasis added) (quoting *Parks,* 494 U.S. at 488, 110 S.Ct. at 1260). Then, after reciting the "pre-existing normative rule" of *Jurek, Lockett,* and *Eddings,* that it was unconstitutional for a state to foreclose completely a jury's consideration of mitigating evidence, the Court concluded that reasonable jurists considering Graham's claim at the time his conviction became final would not have felt that these cases " '*dictated* ' vacatur of petitioner's death sentence." *Graham,* —— U.S. at ——, 113 S.Ct. at 900 (quoting *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070). "To the contrary," the Court reasoned,

---

**3.** The second of these questions allowed for consideration of mitigating evidence. That question asked "whether there is a probability that the defendant would commit criminal acts of vio-

lence that would constitute a continuing threat to society." Tex.Code Crim.Proc.Ann. art. 37.-071(b) (Vernon 1981).

to most readers at least, these cases reasonably would have been read as upholding the constitutional *validity* of Texas' capital sentencing scheme with respect to mitigating evidence and otherwise ... [because] it permitted petitioner to place before the jury whatever mitigating evidence he could show, including his age.

*Graham,* —— U.S. at ——, 113 S.Ct. at 900. Thus, because the caselaw existing when Graham's conviction became final would reasonably have been understood as dictating not the relief Graham sought, but rather an affirmance of his conviction and sentence, the Court held that Graham sought a new rule and therefore that his claim was *Teague*-barred. *Compare ante* at 886 ("In sum, when we apply an extant normative rule to a new set of facts ... generally we do *not* announce a new constitutional rule of criminal procedure for purposes of *Teague.*" (emphasis added)).

*Graham* thus confirms that the Supreme Court has given full effect both to its unambiguous directive that a claim is barred unless a holding *in the defendant's favor* would be dictated by precedent existing at the time the defendant's conviction became final, and to the corollary that a claim merely "predicated on" or governed by prior precedent is not saved from the sweep of the "new rule" doctrine.

If there were any question that this is the standard applied by the Supreme Court, it is laid to rest by the *Graham* Court's discussion, and ultimate distinction, of *Penry.* *See Johnson,* —— U.S. at —— – ——, 113 S.Ct. at 2668–69 (noting differences between *Graham* and *Penry* ). Penry, like Graham, challenged the application of Texas' then-existing death penalty statute. Penry, as did Graham, sought *vacatur* of his death sentence on the grounds that Texas' "special issues" death penalty procedure precluded his jury from giving full effect to his mitigating evidence, in violation of *Jurek, Lockett,* and *Eddings.* At a *general* level, Penry's and Graham's arguments were virtually identical;

they differed only with respect to the specific type of mitigating evidence, the consideration of which each claimed had been foreclosed from juror consideration. In Penry's case, the evidence was of his organic brain damage and history of childhood abuse; in Graham's, the evidence was of his youth, deprived upbringing, and redeeming character traits.

In determining that *Penry* (as well as *Jurek, Lockett,* and *Eddings* ) did not "dictate" granting Graham's requested relief, the Court distinguished *Penry* (as well as *Lockett* and *Eddings* ) as cases in which "the constitutional defect lay in the fact that relevant mitigating evidence was placed *beyond* the effective reach of the sentencer." *Graham,* —— U.S. at ——, 113 S.Ct. at 902 (emphasis added); *see also Johnson,* —— U.S. at —— – ——, 113 S.Ct. at 2668–69 (expressly noting *Graham* 's distinction of *Penry* on the ground that Penry's mitigating evidence had not been given effect at his sentencing, whereas Graham's had; distinguishing Johnson's case from Penry's on same ground). *Unlike* Graham's (and Jurek's) evidence, the Court explained, Penry's evidence—that he suffered from organic brain damage and that he had been physically abused as a child—could be given only "aggravating" effect in the context of the Texas scheme. *Graham,* —— U.S. at ——, 113 S.Ct. at 901.

On the basis of this distinction, *i.e.,* that Penry's jury was not, but Graham's was, permitted to consider mitigating evidence as such, the Court concluded that although granting Penry's relief did not announce a rule new from that in *Jurek,* granting Graham's requested relief would. *See id.* at ——, 113 S.Ct. at 902 ("This distinction leads us to conclude that neither *Penry* nor any of its predecessors *'dictates' the relief Graham seeks* within the meaning required by *Teague.*" (emphasis added)); *see also Johnson,* —— U.S. at —— – ——, 113 S.Ct. at 2668–69. And, in a passage that reconfirms that the focus of the *Teague* inquiry is on the relief sought by the petitioner, the Court observed,

even if *Penry* reasonably could be read *to suggest* that Graham's mitigating evidence was not adequately considered under the former Texas procedures, that is not the relevant inquiry under *Teague*. Rather, the determinative question is whether reasonable jurists reading the case law that existed in 1984 could have concluded that Graham's sentencing was not constitutionally infirm. We cannot say that all reasonable jurists would have deemed themselves *compelled to accept Graham's claim* in 1984.... The ruling Graham seeks, therefore, would be a "new rule" under *Teague.*

*Graham,* —— U.S. at ———— ——, 113 S.Ct. at 902–03 (emphasis added).[4]

Although the *Graham* majority and dissent disagreed over whether the differences in the type of mitigating evidence offered by Penry and Graham, and the opportunity that each petitioner's jury had to consider that evidence, were sufficient to implicate a new rule in holding for Graham, the dissent never challenged the fundamental premise of *Graham* and the Court's prior cases that *Teague* bars consideration of a claim where the defendant could not even have prevailed on the merits under the law existing at the time his conviction became final. *See* discussion *supra* at 907–08; *see also West,* —— U.S. at ——, 112 S.Ct. at 2501 (Souter, J., concurring) (rule is new unless it "dictate[s] the

rule on which the conviction may be held to be *un* lawful" (emphasis added)).

*Graham,* in short, proves that for *Teague* purposes the majority has a different understanding of the concept of "applying" prior precedent than does the Supreme Court. The majority holds that a new rule is not created if prior precedent is determinative of the result in the case—whether in the petitioner's favor or against him. The Supreme Court could not have been clearer that avoidance of a new rule is possible only where the prior precedent resolves the case in the petitioner's favor. If the Supreme Court had understood the concept as does the majority here, the holding in *Graham* would have been different.

### B.

*Graham* also demonstrates how the majority misreads *Penry* and why the majority mistakenly believes *Penry* supports its understanding of the "new rule" doctrine. Because the majority never comes to grips with *Graham,* it does not recognize that the Court's holding in *Penry,* that the petitioner did not seek a new rule, rested on the conclusion that *Jurek* dictated the resolution of Penry's claim *in his favor,* and not on the fact that *Jurek* in some more general sense governed resolution of the case.[5] That this

---

**4.** *Graham,* and its distinction of *Penry,* follow naturally from *Teague* 's instruction that new obligations are not to be imposed on the states via federal *habeas* review. When Penry's conviction became final, the law was clear that "the State must allow the jury to give effect to mitigating evidence in making the sentencing decision." *Parks,* 494 U.S. at 491, 110 S.Ct. at 1262 (citing *Lockett* and *Eddings* ). As noted, the *Penry* majority concluded that the jury could not give any mitigating effect to his evidence within the strictures of the "special issues." Hence, vacating Penry's death sentence, and requiring an additional instruction that the jury could consider his mitigating evidence as such, did not "impose a new obligation," *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070, on the State of Texas. Such an obligation—*i.e.,* that although Texas could channel the effect of a defendant's mitigating evidence, it could not foreclose consideration of that effect altogether—had already been imposed by prior law. Vacating Graham's death sentence, by contrast, would have required a holding that Texas could not channel the effect of a defendant's mitigating evidence at all. Because *Jurek*

had approved Texas' sentencing procedure, which restricted a defendant's use of mitigating evidence to the context of the special issue of future dangerousness, such a holding would unquestionably have announced a new rule.

**5.** The majority ascribes significance to the fact that the Court's holding in *Penry* "repudiated prior Fifth Circuit decisions," *ante* at 884:

> One would think this was an easy case; granting Penry the relief he sought seemingly would have required the creation of a new rule insofar as it would have repudiated prior Fifth Circuit decisions. And, with those Fifth Circuit cases in the legal landscape, presumably a state court at the time [Penry's] conviction became final would not have felt compelled to grant Penry the relief he sought.
>
> *Id.*
> This fact of course is not in any way dispositive of the *Teague* inquiry. Prior circuit court decisions not infrequently are "objectively unreasonable," as the Supreme Court found with respect to two Fifth Circuit decisions in *String-*

was the Court's reasoning in *Penry* is evident, if from nothing else, from the fact that the Court specifically framed the question before it as "whether granting [Penry] the relief he seeks would create a 'new rule,'" *Penry*, 492 U.S. at 313, 109 S.Ct. at 2944 (citation omitted), and resolved this question in the same terms, *id.* at 319, 109 S.Ct. at 2947 ("[I]n light of the assurances upon which *Jurek* was based, we conclude that *the relief Penry seeks* does not 'impos[e] a new obligation' on the State of Texas." (emphasis added) (citation omitted)).

Therefore, contrary to the majority's belief, *Penry* was not a "novel" decision, *see ante* at 884; nor does it "demonstrate[ ] ... the critical distinction between the *extension* of an existing rule on collateral review and the mere *application* of an existing normative rule ... to a new set of facts," *id.* at 884 (footnote omitted). Rather, as the Court said in *Penry* itself, *see* 492 U.S. at 314–19, 109 S.Ct. at 2944–47, and as it reaffirmed in *Johnson*, *Penry* was a narrow decision entailing a straightforward application of *Jurek*, *Lockett*, and *Eddings* so as to provide Penry with the relief to which he was entitled under those cases:

> The Court [in *Penry* ] was most explicit in rejecting the dissent's concern that Penry was seeking a new rule, in contravention of *Teague v. Lane*. Indeed, the Court characterized its holding in *Penry* as a straightforward application of our earlier rulings in *Jurek*, *Lockett*, and *Eddings*, making it clear that these cases can stand together with *Penry*.
>
> We confirmed this limited view of *Penry* and its scope in *Graham v. Collins*.

*Johnson*, — U.S. at ——–——, 113 S.Ct. at 2667–68 (citations omitted). Had the majority here not ignored *Graham*, it would have understood *Penry*, as does the Supreme Court, as a case where a new rule was not implicated because the relief sought was dictated by prior precedent, specifically *Jurek*.

---

*er, see* — U.S. at ——, 112 S.Ct. at 1140. A "reasonable jurist" would simply ignore such objectively unreasonable decisions. In this respect, a reasonable jurist is freer than sitting judges, as *Penry* itself proves. Although the Fifth Circuit panel believed that its prior deci-

## III.

The majority compounds the error caused by its unexplained refusal to consider *Graham*, and its resulting misreading of *Penry*, by misconstruing *Stringer* and *Cartwright*, the Court's cases that have addressed *Godfrey* challenges in the context of *Teague*'s "new rule" doctrine.

### A.

In a statement that betrays the extent of its departure from Supreme Court precedent, the majority says that, "*Stringer* ... teaches that *Teague* does not bar a habeas petitioner's *invocation of Godfrey* to challenge the constitutional sufficiency of limiting instructions or appellate review if a state uses a vague aggravating factor." *Ante* at 881 (emphasis added); *see also id.* at 881 (the Supreme Court held in *Stringer* "that the application of *Godfrey* does not amount to a new rule for purposes of *Teague* "). *Stringer*, of course, teaches nothing of the sort; rather, *Stringer* holds only that the application of *Godfrey* in the context of the particular facts of *Cartwright* and *Clemons* did not require announcement of new rules. *Stringer*, in short, was an unexceptional application of the Court's consistently-applied standard that granting a *habeas* petitioner his requested relief will not "extend" *Godfrey* so as to announce a new rule when that relief, *i.e., a holding in favor of the defendant*, is "dictated" by *Godfrey*. This is brought into relief, as in *Penry*, by the Court's own statement of the issue before it, namely, "whether granting the relief sought [by the petitioner] would create a new rule because the prior decision is applied in a novel setting, thereby extending the precedent." *Stringer*, — U.S. at ——, 112 S.Ct. at 1135.

### 1.

The question before the Court in *Stringer* was whether either *Cartwright* or *Clemons*

---

sions conflicted with the Supreme Court's holdings regarding restrictions on the consideration of mitigating evidence, *Penry v. Lynaugh*, 832 F.2d 915, 926 (5th Cir.1987), it nonetheless concluded that, as a panel, it was bound by those decisions.

announced a new rule for purposes of *Teague*.[6] The Court held that neither did.

The facts and circumstances in *Cartwright* were virtually indistinguishable from those in *Godfrey*. In *Cartwright*, the Court found that "the language of the Oklahoma aggravating circumstance at issue—'especially heinous, atrocious, or cruel'—gave no more guidance than the 'outrageously or wantonly vile, horrible or inhuman' language that the jury returned in its verdict in *Godfrey*," and that "the conclusion of the Oklahoma court that the events recited by it 'adequately supported the jury's finding' was indistinguishable from the action of the Georgia court in *Godfrey*, which failed to cure the unfettered discretion of the jury and to satisfy the commands of the Eighth Amendment." *Cartwright*, 486 U.S. at 363–64, 108 S.Ct. at 1859.

*Stringer* summarily held that *Cartwright* did not announce a rule "new" from *Godfrey* precisely because the instructions on the aggravating circumstance in *Cartwright* and *Godfrey* were as close to identical as was possible given the differing sentencing contexts in Oklahoma and Georgia. Given these similarities, reasonable jurists reading the caselaw existing at the time of Cartwright's sentencing, which included *Godfrey*, would have felt compelled to rule in Cartwright's favor. That is, *Godfrey* dictated the relief sought by Cartwright. *Compare Graham*, — U.S. at —, 113 S.Ct. at 902.

Put another way, if *Teague* had been decided before *Cartwright*, and if Oklahoma had invoked *Teague* in its argument before the Supreme Court, the Court would have held that reasonable jurists could *not* have concluded that Cartwright's jury instructions complied with *Godfrey*, and thus would have been "compelled to rule in his favor." As the Tenth Circuit noted in *Cartwright*, the Oklahoma Court of Criminal Appeals had dropped from its so-called limiting construction the one phrase that the Supreme Court *had* previously approved as constitutionally limiting an analogous, vague aggravating factor, *i.e.*, "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *Cartwright v. Maynard*, 822 F.2d 1477, 1489 (10th Cir.1987) (citing *Proffitt v. Florida*, 428 U.S. 242, 255–56, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 (1976)).

Although the majority seems to think otherwise, the fact that the Oklahoma Court of Criminal Appeals had previously approved unconstitutionally vague limiting instructions only demonstrates that the Oklahoma court's prior actions were objectively "unreasonable" for *Teague* purposes, just as in *Stringer* the Fifth Circuit had been objectively "unreasonable" in holding that *Godfrey* did not apply to Mississippi's capital punishment scheme. *See Stringer*, — U.S. at —, 112 S.Ct. at 1140 ("The short answer ... is that the Fifth Circuit made a serious mistake in *Evans v. Thigpen* [809 F.2d 239 (5th Cir. 1987)] and *Johnson v. Thigpen* [806 F.2d 1243 (5th Cir. 1986)] [in so concluding]."). *See also supra* note 5.

## 2.

Contrary to the majority's impression, the significant holding in *Stringer* was not that *Cartwright* did not announce a new rule. Mississippi had conceded this point, *see Stringer*, — U.S. at —, 112 S.Ct. at 1135, which renders curious the majority's assertion that "[t]he State of Mississippi invoked *Teague*, arguing that the petitioner could not rely on *Cartwright* because that decision was announced after his conviction became final." *Ante* at 881. And the Supreme Court deemed the state's concession "wise":

> In the case now before us Mississippi does not even argue that [*Cartwright*] itself announced a new rule. To us this appears

---

6. As did Graham, Stringer sought the benefit of decisions that postdated the finality of his conviction. The Supreme Court stated in *Stringer* that the threshold question when a *habeas* petitioner relies on a subsequent decision is "whether the decision relied on announced a new rule." *Stringer*, — U.S. at —, 112 S.Ct. at 1135. If it is determined that the subsequent decision did not announce a new rule, a second inquiry must be undertaken. That inquiry is "whether grant-

ing the relief sought would create a new rule because the prior decision is applied in a new setting, thereby extending the precedent." *Id.* Where instead, as here, the petitioner seeks the benefit of a decision that predated the finality of his conviction, the question is simply whether the relief he seeks is dictated by that precedent. In substance, the questions in the two contexts are identical.

a wise concession. *Godfrey* and [*Cartwright* ] did indeed involve somewhat different language. But it would be a mistake to conclude that the vagueness ruling of *Godfrey* was limited to the precise language before us in that case. In applying *Godfrey* to the language before us in [*Cartwright* ], we did not "brea[k] new ground." *Stringer,* —— U.S. at ——, 112 S.Ct. at 1135 (quoting *Butler,* 494 U.S. at 412, 110 S.Ct. at 1216). Rather, the significant holding of *Stringer,* a holding the majority never even mentions, was that *Clemons* did not announce a rule new from *Godfrey* either.

In *Stringer,* Mississippi contended that *Clemons,* a direct review case decided after Stringer's conviction became final, had announced a new rule, and thus was unavailable to Stringer as authority in support of the relief he sought. The state argued that reasonable jurists would not have believed that the *Clemons* holding was dictated by prior precedent because Mississippi required aggravating factors to be weighed against mitigating circumstances in determining whether to impose the death penalty, unlike Oklahoma and Georgia, which required only that a single aggravating factor support a death penalty. *Stringer,* —— U.S. at ——, 112 S.Ct. at 1136.

The Supreme Court rejected the state's contention, noting that if anything, *Godfrey* clearly applied in a "weighing" state such as Mississippi:

> As a matter of federal law, moreover, the view of the Mississippi Supreme Court that *Godfrey* 's dictates apply to its capital sentencing procedure is correct. Indeed, it is so evident that the issue was not even mentioned in *Clemons.*

*Id.* at ——, 112 S.Ct. at 1139. In a weighing state, the Court reasoned, the effect of an invalid aggravating factor cannot be cured without either trial or appellate reweighing, because it cannot be known if, absent the invalid factor, the jury would have weighed the aggravating factors and mitigating circumstances in the way it initially did:

> When the weighing process itself has been skewed, only constitutional harmless-error analysis or reweighing at the trial or appellate level suffices to guarantee that the

defendant received an individualized sentence.

*Id.* at ——, 112 S.Ct. at 1137. In the end, then, the Court concluded that the different roles played by the aggravating factor in the Georgia, Oklahoma, and Mississippi schemes "underscore[ ] the applicability of *Godfrey* and [*Cartwright* ] to the Mississippi system." *Id.*

The relevant facts in *Clemons,* therefore, were no different from those in *Godfrey.* In both cases, the death penalty had been imposed on the basis of an invalid aggravating factor. *See Clemons,* 494 U.S. at 742–43, 110 S.Ct. at 1445 ("[T]he trial court instructed [Clemons'] jury in the bare terms of the Mississippi [aggravating] statute."). And in neither case was that factor cured on appeal: In *Godfrey,* there was essentially no review at all, while in *Clemons* there was no evidence that the Mississippi Supreme Court had undertaken the reweighing that was constitutionally necessary under a scheme such as Mississippi's. *Id.* at 751–52, 110 S.Ct. at 1449–50. For these reasons, the Court held that *Godfrey* dictated the relief sought by Clemons, and therefore that *Clemons* had not announced a new rule. *See Stringer,* —— U.S. at ———–——, 112 S.Ct. at 1136–40; *see also id.* at ——, 112 S.Ct. at 1144 (Souter, J., dissenting) (criticizing majority for concluding "that the outcome in *Cartwright* and *Clemons* was dictated" by existing precedent).

### 3.

*Stringer,* in sum, does not support the decision reached by the majority. *Stringer* did not hold, as the majority assumes, that neither *Clemons* or *Cartwright* announced a new rule because their claims were "predicated on" *Godfrey,* or because *Godfrey* "dictated" their "challenges." The Court held that no new rule had been created in either case because the facts underlying each petitioner's claim were materially indistinguishable from those underlying Godfrey's claim and therefore *Godfrey* dictated the relief sought by each.

If the facts and circumstances underlying Turner's claim were as indistinguishable

from those underlying Godfrey's claim as were Cartwright's and Clemons', *Godfrey* would likewise dictate the relief Turner seeks. Obviously, however, they are not. *See* discussion *infra* at 916–19. *Compare ante* at 882 ("The similarities between *Cartwright* and the instant case are striking.").

### B.

Next, in order to reconcile *Cartwright* with its misstatement of the *Stringer* rationale, the majority must omit the relevant facts of *Cartwright*. The majority recites that "Cartwright's sentencing jury was given a limiting instruction beyond the bare terms of the heinousness factor," *id.* at —— (citing *Cartwright v. Maynard*, 822 F.2d 1477, 1488 (10th Cir.1987)), and that "the Oklahoma Court of Criminal Appeals affirmed after applying a limiting construction to the facts of Cartwright's case, focusing on the 'manner' in which the murder was committed," *id.* (citing *Cartwright v. Oklahoma*, 695 P.2d 548, 554 (Okla.Crim.App.1985)). Both statements, while literally correct, are incomplete in the only respects that are relevant.

As the record in *Cartwright* discloses, and the Supreme Court in *Stringer* held, the *Cartwright* jury instructions and appellate review were indistinguishable in substance from the instructions and review held to be inadequate in *Godfrey*. The so-called "limiting" instruction of the Oklahoma aggravating factor for murders that were "especially heinous, atrocious or cruel," which the majority omits, reads as follows:

> The term 'heinous' means extremely wicked or shockingly evil; 'atrocious' means outrageously wicked and vile; 'cruel' means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.

*Cartwright*, 822 F.2d at 1488. As the Supreme Court explained in *Stringer*, "appl[ying] the same analysis and reasoning [of *Godfrey* ]," the Court in *Cartwright* held

that "th[is] language gave no more guidance than did the statute in *Godfrey*." *Stringer,* —— U.S. at ——, 112 S.Ct. at 1135. Or, as Justice Marshall later observed, Cartwright's instruction provided no limitation whatsoever on the jury's discretion: "[L]ike 'heinous' and 'atrocious' themselves, the phrases 'extremely wicked or shockingly evil' and 'outrageously wicked and vile' could be used by ' "[a] person of ordinary sensibility [to] fairly characterize almost *every* murder." ' " *Shell,* 498 U.S. at 3, 111 S.Ct. at 314 (Marshall, J., concurring) (quoting *Cartwright*, 486 U.S. at 363, 108 S.Ct. at 1858 (quoting in turn *Godfrey*, 446 U.S. at 428–29, 100 S.Ct. at 1765)) (emphasis added in *Shell* ).[7] Cartwright's instructions therefore were unconstitutional under *Godfrey* because they could not reasonably be said to have provided a "principled way to distinguish [a] case, in which the death penalty was imposed, from the many cases in which it was not." *Godfrey*, 446 U.S. at 433, 100 S.Ct. at 1767.

Cartwright's appellate review was similarly inadequate. In its opinion affirming the Tenth Circuit, the Supreme Court characterized that review as follows: "[T]he Oklahoma court simply had reviewed all of the circumstances of the murder and decided whether the facts made out the aggravating circumstance," which itself was unconstitutionally vague. *Cartwright*, 486 U.S. at 360, 108 S.Ct. at 1857 (citing *Cartwright*, 822 F.2d at 1491). The Court continued: "[T]he conclusion of the Oklahoma court that the events recited by it 'adequately supported the jury's finding' was *indistinguishable* from the action of the Georgia court in *Godfrey*, which failed to cure the unfettered discretion of the jury and to satisfy the commands of the Eighth Amendment." *Cartwright*, 486 U.S. at 364, 108 S.Ct. at 1859 (emphasis added). Thus, what the majority describes as the Oklahoma appellate court's "limiting construction [applied] to the facts of Cartwright's case, focusing on the 'manner' in

---

7. The instruction with respect to the definition of the term "cruel" was apparently more limiting. However, Oklahoma's "heinousness" aggravating factor was phrased in the disjunctive, and therefore Cartwright's jury could have imposed the death penalty based on one of the unquestionably vague terms. Thus, the "cruelty" instruction cannot serve to distinguish Cartwright's instructions from Godfrey's. *Shell,* 498 U.S. at 3–4, 111 S.Ct. at 314 (Marshall, J., concurring).

which the murder was committed," *ante* at 881, was, under *Godfrey,* no limitation at all.

*Cartwright* therefore is no different from *Clemons* (or, in principle, from *Penry* ). And all three are properly understood simply as cases in which new rules were not announced because the facts and circumstances presented by the petitioner in each were so close to those present in the prior precedent that the prior decisions, when applied, dictated the relief each petitioner sought. Of course, the similarities between *Godfrey, Cartwright,* and *Clemons,* on the one hand, and Turner's case on the other, are anything but "striking." *Compare ante* at 882.

### C.

Finally, as it mistakenly believes it must to remain consistent, the majority misreads *Shell* in much the same way that it misreads *Stringer* and *Cartwright,* and for this reason, its attempt to summon *Shell* in support of its conclusion that any claim "predicated on" *Godfrey* is not *Teague*-barred is ill-fated.

The Court in *Shell* held that the aggravating factor challenged by the petitioner was the same as that invalidated in *Cartwright* and that the limiting construction was, as Justice Marshall noted, "nearly identical" to the instruction given by the trial court in that case. *Shell,* 498 U.S. at 2, 111 S.Ct. at 314 (Marshall, J., concurring). In sum, "there [was] no legally tenable distinction ... between [*Shell* ] and *Maynard v. Cartwright.*" *Id.* at 4, 111 S.Ct. at 314. Given that there were no material differences between the jury instructions and appellate reviews in *Shell* and *Cartwright,* there is not the requisite factual predicate for the majority's conclusion that *Shell* supports the newly announced standard that the prior precedent must only dictate the result in the case, not the relief sought. *Shell* is analytically no different from *Clemons,* or from *Cartwright,* freed from the context of *Teague.* Thus, any attempt to divine the majority's standard from the reasoning in *Shell* is futile.

### D.

The majority appears ultimately to have been misled by the coincidence that in all of the Court's *Godfrey* cases discussed above, the Court held that *Godfrey* dictated resolution of the petitioner's claim. From this the majority infers that the disposition of a *Godfrey* challenge can never announce a new rule. Its error, of course, is its failure to understand that the holdings in all of these cases rested on the Court's conclusion that the facts underlying each petitioner's claim— unlike those underlying Turner's claim— were indistinguishable from the facts in *Godfrey,* and therefore that *Godfrey* dictated the relief sought by each petitioner.

### IV.

### A.

When the Supreme Court's precedents are properly read and applied, it is obvious that *Godfrey* cannot possibly be said to dictate the relief Turner seeks, because the facts underlying Turner's claim are precisely the opposite of, and therefore *ipso facto* distinguishable from, those underlying Godfrey's claim. *See West, —— U.S. at ——,* 112 S.Ct. at 2497 (O'Connor, J., concurring) ("[F]ederal courts must make an independent evaluation of the precedent existing at the time the state conviction became final in order to determine whether the case under consideration is meaningfully distinguishable."). This is so even though, in the words of the majority's standard, Turner's claim may be said to be "predicated on" *Godfrey* and his "challenge" "dictated" by that case. *See Parks,* 494 U.S. at 491, 110 S.Ct. at 1262 (holding that it is not enough that the prior decision "inform, or even control or govern" analysis of the petitioner's claim).

The distinctions between *Godfrey* and the case *sub judice,* which perforce even the majority must recognize, are evident upon the most cursory review. The only instructions that Godfrey's jury received were that it could impose the death penalty if it found that his offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." *Godfrey,* 446 U.S. at 422, 100 S.Ct. at 1762 (quoting Ga.Code § 27–2534.1(b)(7) (1978)). God-

frey's trial judge made no effort to define further the terms "aggravated battery" or "depravity of mind." *See Godfrey,* 446 U.S. at 426, 100 S.Ct. at 1764. When Godfrey's jury imposed the death sentence, it specified only that "the offense of murder was outrageously or wantonly vile, horrible and inhuman." *Id.* And in affirming Godfrey's sentence, the Georgia Supreme Court stated merely that the jury's phraseology was "not objectionable," *Godfrey v. State,* 243 Ga. 302, 253 S.E.2d 710, 718 (1979), and that the evidence supported the jury's finding of the statutory aggravating circumstance, *id.* 253 S.E.2d at 717–18.

By contrast, Turner's jury was instructed on both the "aggravated battery" and "depravity of mind" prongs of Virginia's "vileness" aggravating factor. The trial court informed the jury that "an aggravated battery is a battery which qualitatively and quantitatively is more culpable than the minimum necessary to accomplish an act of murder," J.A. at 517–P, and that "depravity of mind is a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation," *id.* at 517–Q. It further instructed that "[m]aliciously means intentionally doing a wrongful act to another without legal excuse or justification." *Id.* at 517–I. These instructions on "aggravated battery" and "depravity of mind" tracked the Virginia Supreme Court's limiting constructions set forth in *Smith v. Commonwealth,* 219 Va. 455, 477, 248 S.E.2d 135, 149 (1978), *cert. denied,* 441 U.S. 967, 99 S.Ct. 2419, 60 L.Ed.2d 1074 (1979), which have been consistently applied without reversal.

Turner's appellate review, too, was quite different from Godfrey's. In stark contrast to the substantively meaningless appellate review of Godfrey's sentence, the Virginia Supreme Court, on Turner's direct appeal of his currently challenged sentence, applied the limiting constructions from *Smith* to Turner's facts, to hold that his crime both constituted an "aggravated battery" and demonstrated "depravity of mind." *Turner v. Commonwealth,* 234 Va. 543, 553, 364 S.E.2d 483, 489, *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988) ("We think that

the evidence of Turner's conduct in killing his victim meets [the *Smith* definition of aggravated battery] clearly and completely.... We think that the evidence of Turner's conduct in killing his victim also meets [the *Smith* definition of depravity of mind] clearly and completely.").

As the majority's own opinion shows, reasonable jurists considering Turner's claims at the time his conviction became final would have concluded that his sentencing procedures easily satisfied *Godfrey*'s commands. *See ante* at 891–94. By requiring that the jurors find factors above and beyond those present in all intentional killings, Turner's jury instructions reasonably could be said to have satisfied the plurality's commands in *Godfrey* that aggravating factors be limited so that they are not applicable to every murder, and that juries be provided with a "principled way to distinguish [a] case, in which the death penalty was imposed, from the many cases in which it was not." *Godfrey,* 446 U.S. at 433, 100 S.Ct. at 1767; *see also Proffitt v. Florida,* 428 U.S. 242, 255, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 (1976) (plurality opinion) (stating that the Florida Supreme Court had imposed a constitutional construction on Florida's "heinousness" aggravating factor by limiting it to the " 'conscienceless or pitiless crime which is unnecessarily torturous to the victim' " (quoting *State v. Dixon,* 283 So.2d 1, 9 (Fla.1973))). In fact, that Turner's instructions met *Godfrey*'s commands is the import of this circuit's 1985 decision in *Turner v. Bass,* 753 F.2d 342, 353 (4th Cir.1985), *rev'd on other grounds sub nom. Turner v. Murray,* 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), which rejected Turner's similar *Godfrey* challenge to the *Smith* limiting construction of aggravated battery.

So too, by applying the *Smith* limiting constructions to the facts of Turner's case, the Virginia Supreme Court performed exactly the appellate review that one reasonably would think *Godfrey* required. *Compare Cartwright,* 486 U.S. at 363, 108 S.Ct. at 1859 ("The affirmance of the death sentence by the Georgia Supreme Court [in *Godfrey* ] was held to be insufficient to cure the jury's unchanneled discretion because that court

failed to apply its previously recognized limiting construction of the aggravating circumstance."). Given that Turner shot Smith twice while Smith lay helpless from the first shot to his head, and assertedly killed Smith merely for "snitching" on him, *compare Godfrey*, 446 U.S. at 433, 100 S.Ct. at 1767 (victims killed instantly from shots to head), there is no doubt that a "reasonable jurist" would have concluded that the state court's assessment was the product of conscientious and meaningful appellate review. As a panel of this court said in *Turner v. Bass*, "the murder here was cold-blooded and calculated, involving no element of emotional trauma as was present in *Godfrey*. Turner initially shot Smith for no reason at all. While Smith lay alive but helpless and while Officer Bain

pleaded, Turner fired two shots into Smith's chest." *Turner*, 753 F.2d at 353.

Contrary to Turner's contention, constitutionally inadequate appellate review is not demonstrated by the mere statistic that the Virginia Supreme Court has not overturned a single death sentence based on the "vileness" factor. Without more, the statistic could as easily reflect that Virginia juries impose, and its courts affirm, capital punishment based on the "vileness" factor only in the most gruesome circumstances. The endless parentheticals in Turner's brief summarizing the hideous fact patterns of those crimes appear to bear out just this.[8] It is only regrettable that the state of capital punishment law is such that one legitimately can argue against

8. *See* Brief of Appellant at 53 n. 19 (citing *George v. Commonwealth*, 242 Va. 264, 411 S.E.2d 12 (1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1591, 118 L.Ed.2d 308 (1992) (defendant sodomized child victim and used stun gun on victim's penis); *Strickler v. Commonwealth*, 241 Va. 482, 404 S.E.2d 227, *cert. denied*, —— U.S. ——, 112 S.Ct. 386, 116 L.Ed.2d 337 (1991) (defendant abducted victim, stripped her, beat her, and sexually assaulted her before killing her by crushing her head in four places with large rock); *Stockton v. Commonwealth*, 241 Va. 192, 402 S.E.2d 196, *cert. denied*, —— U.S. ——, 112 S.Ct. 280, 116 L.Ed.2d 231 (1991) (defendant shot victim and cut off his hands at the wrists while victim still alive); *Bennett v. Commonwealth*, 236 Va. 448, 374 S.E.2d 303 (1988), *cert. denied*, 490 U.S. 1028, 109 S.Ct. 1765, 104 L.Ed.2d 200 (1989) (over extended period, bound victim suffered repeated blows to head and face, was stabbed four times and strangled); *Correll v. Commonwealth*, 232 Va. 454, 352 S.E.2d 352, *cert. denied*, 482 U.S. 931, 107 S.Ct. 3219, 96 L.Ed.2d 705 (1987) (defendant choked victim, robbed him, kicked him in face several times and used unconscious body as target for knife-throwing); *Wise v. Commonwealth*, 230 Va. 322, 337 S.E.2d 715 (1985), *cert. denied*, 475 U.S. 1112, 106 S.Ct. 1524, 89 L.Ed.2d 921 (1986) (defendant struck victim's head repeatedly, broke three of victim's fingers, tore flesh from nose and forehead, shot victim in eyeball, threw victim in outdoor toilet and fired shotgun in victim's chest); *Poyner v. Commonwealth*, 229 Va. 401, 329 S.E.2d 815, *cert. denied*, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 158 (1985) (defendant tortured one victim before shooting her in back of head after he ordered her to walk away from him and defendant stripped second victim, raped her, shot her in head and flung her nude body into parking lot); *Jones v. Commonwealth*, 228 Va. 427, 323 S.E.2d 554 (1984), *cert. denied*, 472 U.S. 1012, 105 S.Ct. 2713, 86 L.Ed.2d 728 (1985) (defendant tied one

victim's hands behind her, stuffed sock down her throat, taped mouth and neck, forced her in closet, shot her point blank, doused her with accelerant and set her on fire, and left her still alive and breathing to die of smoke inhalation; attempted to incinerate second victim); *Clozza v. Commonwealth*, 228 Va. 124, 321 S.E.2d 273 (1984), *cert. denied*, 469 U.S. 1230, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1985) (defendant beat 13-year-old victim for over two hours, raped her and penetrated her vagina with twigs and large cylindrical object before internal bleeding suffocated her); *Fitzgerald v. Commonwealth*, 223 Va. 615, 292 S.E.2d 798 (1982), *cert. denied*, 459 U.S. 1228, 103 S.Ct. 1235, 75 L.Ed.2d 469 (1983) (defendant inflicted 184 stab wounds with machete and knife, all sustained before victim's death); *LeVasseur v. Commonwealth*, 225 Va. 564, 304 S.E.2d 644 (1983), *cert. denied*, 464 U.S. 1063, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984) (victim sustained at least 43 wounds and lacerations; back of head crushed by blows with blunt instrument; ice pick and two-pronged carving fork found protruding from victim's back; victim's ankles bound together; liquid bleach poured over body; and attempt to incinerate body); *Whitley v. Commonwealth*, 223 Va. 66, 286 S.E.2d 162, *cert. denied*, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982) (defendant confessed to choking 63-year-old widow with bare hands, strangling her with rope, and cutting her throat; victim was found with one umbrella inserted into her vagina and another in her rectum); *Briley v. Commonwealth*, 221 Va. 563, 273 S.E.2d 57 (1980) (defendant raped woman in front of husband and child, after which woman was shot in head four times while family watched, husband was then shot in front of child, and finally child was shot); *Mason v. Commonwealth*, 219 Va. 1091, 254 S.E.2d 116, *cert. denied*, 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979) (defendant raped 71-year-old woman, struck her several times in head and body with an ax, shoved ax

the death penalty, as does Turner, on the ground that his crime "did not involve rape, torture, abuse of the body or other mutilation," but merely the intentional, coldblooded murder of another human being. Brief of Appellant at 51. *Cf. Godfrey.*[9]

Because the *Smith* limiting constructions given to Turner's jury and applied by the Virginia Supreme Court—*unlike* the Oklahoma procedures in *Cartwright,* or the Mississippi procedures in *Clemons*—fully satisfied what in 1988 reasonable jurists would have thought were *Godfrey*'s commands, vacating Turner's death sentence on the basis of *Godfrey* clearly would "break new ground." Whereas *Godfrey* "dictated" a holding for the defendants in *Cartwright* and *Clemons,* it just as clearly "dictates" a holding for the Commonwealth here.[10]

The *Jurek/Penry/Graham* line reached the same analytic conclusion conversely. Because Graham's evidence was more like Jurek's than like Penry's, and *Jurek* had held that such evidence was given constitutionally

adequate consideration under the Texas death penalty scheme, extending *Penry* to cover Graham's mitigating evidence would have necessitated "a wholesale abandonment of *Jurek.*" *See Graham,* — U.S. at —, 113 S.Ct. at 902. So also, declaring Turner's sentence *un*constitutional would require not merely an "application" of *Godfrey,* nor even its "extension," but really its repudiation.[11] It would require a holding that the class of death-eligible defendants in Virginia must be narrowed even further than *Godfrey* reasonably indicated, or that the Virginia Supreme Court's review of death sentences should be even more discriminating than *Godfrey* reasonably suggested. Such a holding would, quite obviously, impose a "new obligation," *Teague,* 489 U.S. at 301, 109 S.Ct. 1060, on the Commonwealth of Virginia. *See Butler,* 494 U.S. at 412, 110 S.Ct. at 1216 ("A new decision that explicitly overrules an earlier holding obviously 'breaks new ground' or 'imposes a new obligation.'"). Equally certain, it would announce a new rule of constitutional law.[12]

---

handle into her rectum, drove a nail into her wrist, and set her on fire while still alive)).

**9.** In *Godfrey,* the petitioner had purposefully shot both his wife and mother-in-law in the head with a shotgun, killing each instantly in the presence of his 11–year old daughter. Moments later, he confessed to the police that he had "done a hideous crime, ... but [had] been thinking about it for eight years" and would "do it again." *Godfrey,* 446 U.S. at 425–26, 100 S.Ct. at 1763. The plurality vacated petitioner's death sentence on the ground, *inter alia,* that the death penalty had been imposed capriciously because the victims had been killed "instantaneously," and thus, according to the plurality, the decision to impose the death penalty had not been based on reason.

**10.** *Compare Smith v. Dixon,* 766 F.Supp. 1370, 1383–86 (E.D.N.C.1991), *aff'd,* 996 F.2d 667 (4th Cir.1993), *rev'd on other grounds,* 14 F.3d 956 (4th Cir.1994) (*en banc* ), *cert. denied,* — U.S. —, 115 S.Ct. 129, — L.Ed.2d — (1994) (*Godfrey* dictates relief sought by petitioner when the jury was instructed that "[h]einous means extremely wicked or shockingly evil," and when it was unclear from the record whether the North Carolina Supreme Court had applied an adequate limiting construction).

**11.** It is difficult to understand the majority's statement that in *Jones v. Murray,* 976 F.2d 169 (4th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 27, 120 L.Ed.2d 951 (1992), "we indicated that challenges to Virginia's limiting instructions and appellate review were not barred by *Teague.*"

*Ante* at 882. In *Jones,* our discussion of *Teague* was limited to the following:

Neither party argues that the new cases on which Jones relies [*Stringer* and *Sochor v. Florida,* — U.S. —, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992) ] create a new rule that cannot be applied retroactively in a collateral review of Jones's death sentence. *Cf. Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (prohibiting retroactive application on collateral review of cases that announce new rules). Both sides agree that these cases are firmly grounded in *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (plurality opinion). *See Stringer v. Black,* — U.S. —, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992) (holding that application of *Godfrey* rules to weighing statute was not a new rule). Therefore, there is no procedural bar under *Teague* to the application of the new cases on which Jones relies.

*Id.* at 173. What this passage "indicates" is simply that the *Jones* panel accepted the parties' *agreement* that the two cases on which the petitioner relied, *Stringer* and *Sochor,* did not *themselves* create new rules of constitutional law. It cannot be taken as a statement that every *habeas* petitioner's challenge to Virginia's limiting instructions and appellate review, no matter how strained, is not *Teague*-barred because it happens to be "predicated" on *Godfrey.*

**12.** Turner's claim that his sentence was unconstitutional because "the crime was less culpable than the conduct in other death penalty cases or

### B.

In deciding that Turner is not seeking the benefit of a new rule, the majority endorses for this circuit, *see ante* at 885, the suggestion of Justice Kennedy in *West* that there are certain types of constitutional rules—rules "*designed* for the specific purpose of evaluating a myriad of factual contexts"—that establish general standards "which of necessity require[ ] a case-by-case examination of the evidence," and the application of which therefore only infrequently yields "a result so novel that it forges a new rule, one not dictated by precedent." *West,* ___ U.S. at ___, 112 S.Ct. at 2499 (Kennedy, J., concurring) (emphasis added). Such rules, it seems, may be viewed as allowing for exceptions to the general *Teague* analysis outlined above. Even were I to agree with Justice Kennedy's observations, I would have to disagree with the majority's assertion that the rule of *Godfrey,* like the sufficiency of the evidence rule of *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which Justice Kennedy discussed in *West,* is one of these rules of general application. *See ante* at 885–87.

Certainly the rule of *Godfrey* is no more expansive than the rule of *Jurek* and *Penry,* namely that in channeling a defendant's use of mitigating evidence, the state may not foreclose its mitigating effect altogether. Indeed, the *Godfrey* rule is probably *less* expansive than the *Jurek/Penry* rule, because mitigating evidence certainly comes in more

forms than limiting constructions of unconstitutionally vague aggravating factors. *See, e.g., Clark v. Collins,* 19 F.3d 959, 963 (5th Cir.1994) (sexual abuse); *Crank v. Collins,* 19 F.3d 172, 175 (5th Cir.1994) (trustworthiness, well-disciplined nature, caring and loving character, family values); *Motley v. Collins,* 18 F.3d 1223, 1229 (5th Cir.1994) (physical, sexual, and psychological abuse by parents, including father's "squashing" defendant's pet gerbils to death in front of him); *Madden v. Collins,* 18 F.3d 304, 307–08 (5th Cir.1994) (dyslexia and "personality avoidance disorder"). Since *Graham*—which, significantly, Justice Kennedy joined—establishes that the *Jurek/Penry* rule is not one of the general rules described by Justice Kennedy in *West,* it follows that the narrower rule of *Godfrey* cannot be such a rule.[13] *See also Graham,* ___ U.S. at ___, 113 S.Ct. at 920 (Souter, J., dissenting) (opining that majority's distinction of *Penry* on basis of differences in type of mitigating evidence "flies in the face" of Justice Kennedy's *West* concurrence). Justice Kennedy's own opinion in *West* confirms as much, by nowhere suggesting that *Godfrey, Stringer,* or indeed any case in the *Godfrey* line, qualifies as a rule of general application, notwithstanding that his full discussion of general application rules in *West,* which included an analysis of *Stringer,* offered him ample opportunity to do so. *See West,* ___ U.S. at ___, 112 S.Ct. at 2499 (Kennedy, J., concurring).[14]

---

in many cases in which the defendant was sentenced to life imprisonment," Appellant's Brief at 50, is even more clearly barred because it appears to demand some form of proportionality review *in addition to* application of the *Smith* limiting constructions. However, in 1984, the Supreme Court held that proportionality review was not constitutionally required. *See Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). As for Turner's allegation that his *federal* constitutional rights were violated because his crime does not "fit" within Virginia's vileness factor, granting his relief would require a rule of constitutional law far less deferential to state courts than the "rational factfinder" standard the Supreme Court applied to such claims in *Lewis v. Jeffers,* 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). This assumes, of course, that the application of the "rational factfinder" standard in *Jeffers* itself was dictated by precedent.

**13.** I also conclude that Turner's "vileness" claims do not fall within either of *Teague*'s two exceptions. Granting his relief would not prohibit "a certain category of punishment for a *class of defendants because of their status or offense." Penry,* 492 U.S. at 330, 109 S.Ct. at 2953 (emphasis added). Nor would it lead this court to announce a " 'watershed rule[ ] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Parks,* 494 U.S. at 495, 110 S.Ct. at 1264 (quoting *Teague,* 489 U.S. at 311, 109 S.Ct. at 1075).

**14.** I do not question the majority's conclusion that Turner's *Strickland* claims are not *Teague*-barred, although I do not concur in its reasoning on this score. Essentially for the reasons explained by the majority, I agree with the majority that Turner's ineffective assistance of counsel claims are without merit.

## V.

Because I conclude that reasonable jurists hearing Turner's "vileness" claims in 1988 would, if anything, have felt compelled by existing precedent to rule *against* him on those claims, and therefore that granting his proposed relief and holding his death sentence unconstitutional would announce a new rule of constitutional law, I believe that we are barred from considering those claims under *Teague.* I cannot, therefore, join the majority's opinion, which holds to the contrary.